[Civ. No. 15789. Second Dist., Div. One. Feb. 9, 1948.]

Estate of WILLIAM LLEWELLYN, Deceased. DAVID E. LLEWELLYN, Appellant, v. GWENDOLYN M. CHEESEWRIGHT et al., Respondents.

Joseph Scott, Edward R. Young, J. Howard Ziemann and Cuthbert J. Scott for Appellant.

Jones, Thompson & Kelly and Irving M. Walker for Respondents.

WHITE, J.—This appeal is from a judgment entered on the special verdicts of the jury that the document offered for probate as decedent's last will and testament was executed while he was (1) mentally incompetent to execute such an instrument, and (2) acting under the undue influence of the proponent and appellant herein.

Motions were appropriately made by appellant for a directed verdict, for judgment notwithstanding the verdict, and for a new trial, all of which were denied.

The decedent, William Llewellyn, at the time of his death was about 78 years of age and had resided in this community practically all of his life. He came from a large family —five boys and one girl. All of the brothers and their sister lived in the family home in Berkeley Square, Los Angeles, save and except David Llewellyn, appellant herein, who had married and lived in his own residence. The only sister married John Milner and with her husband continued to reside in the Berkeley Square home. The contestants herein are the issue of the marriage of said sister, Winnie Llewellyn and John Milner. They were raised in the Berkeley Square home with their uncles, other than appellant herein. Gwendolyn continued to live there until her marriage in 1932, and Reese L. Milner continued to live in this house up to the time of the trial.

For some years prior to 1920, the Llewellyn brothers and their sister's husband were engaged in the manufacture and fabrication of steel and iron, as directors and officers of the Llewellyn Iron Works. In January of 1928, Llewellyn Iron Works was merged with or absorbed by Consolidated Steel, and the assets of the former were divided up between the members of the Llewellyn family. All of them except appellant David Llewellyn established an office and functioned as a group. Other than appellant, they continued to live together and with them lived respondents, the children of the sister Winnie and her husband. Prior to the execution of the will here in question, all of the members of the Llewellyn family had died except the testator William Llewellyn, his brother David, appellant herein, and the two contestants and respondents, children of Winnie Llewellyn Milner. Upon the demise of Mrs. Milner in 1942, her husband having predeceased her, the decedent and his nephew Reese Milner, respondent, were the sole occupants of the old family home. However, decedent did not remain there constantly, the rec-

ord indicating that in 1942, 1943 and 1944, he resided for certain intervals at the Jonathan Club in Los Angeles.

In the latter part of 1944, decedent's health was failing and he made complaint thereof to the physical director at the Jonathan Club who recommended that he consult with a doctor. Subsequently, decedent contacted a physician who found it impossible to secure accommodations at any Los Angeles hospital. However, a registered nurse was engaged who reported to decedent at his Berkeley Square residence. At the trial this nurse testified that she treated decedent for a rectal impaction which required frequent flushings and other medical care.

About March 3, 1945, decedent was removed to the Good Samaritan Hospital in Los Angeles, where he remained until his death on September 11 of the same year. While at the hospital decedent was constantly under the care of three special nurses, each working on an eight-hour shift. He was also treated by three physicians, only one of whom was called as a witness at the trial, and who testified that an examination made of decedent immediately upon his entry to the hospital disclosed an abdomen greatly distended with fluid, apparently caused by a liver condition. The fluid was removed from time to time by tapping. Decedent was also treated for his rectal trouble, which seemed to increase as time went on. He also suffered from hardening of the liver, an atrophic cirrhosis of the liver which means a destruction of the liver cells. Decedent was also afflicted with stones in the gall bladder and an ulcer in the rectum. Though decedent's illness never made him bedridden, in the early part of September he became progressively worse until on the 11th of that month he succumbed.

Concerning the circumstances surrounding the execution of the will, the record reveals that some three or four days after decedent's arrival at the hospital, he was visited by his brother, appellant herein. During the visit decedent stated that he desired to see three old friends, namely, Oscar Mueller, Sheriff Biscailuz, and Ernie Rivers; that he wished to see Mr. Mueller "to discuss my affairs and make out a new will." About 5 o'clock on the morning of March 9, decedent's nurse telephoned appellant and said that the decedent "had something very important to talk to him about, to please come up." Appellant went to the hospital, arriving there about 6:30 o'clock, and spent about an hour with

his brother. Nobody else was present. Decedent asked his brother if accommodations could not be secured elsewhere as he was not happy at the hospital. Appellant brother replied that he was going to try the Biltmore Hotel and also the Beverly Hills Hotel, although they were both filled at that time. For the stated reason that decedent had once before requested him to do so, appellant telephoned Attorney Mueller later that morning, stating that his brother wanted to see the attorney about drawing a will. Mr. Mueller, a practicing attorney in Los Angeles since 1898, although semi-active since 1928, had known the Llewellyn family, including the decedent, for some 50 years. However, at no time had he ever represented appellant herein. The latter made arrangements to meet Attorney Mueller after a symphony concert which he and his wife had planned to attend that afternoon, and take them to the hospital. Pursuant to the aforesaid plans, appellant, Attorney Mueller and the latter's wife, proceeded to the hospital at the appointed time. Appellant and Mrs. Mueller remained in one of the downstairs reception rooms while the attorney went upstairs to see the decedent. According to Attorney Mueller, he and the decedent then discussed current affairs for some time and engaged in reminiscences about early days in Los Angeles and other past events. The decedent reminded Attorney Mueller of an incident at a ranch once owned by the Llewellyn family when the lawyer drew a will for him. Decedent told Attorney Mueller he would like to have a will drawn, to which the attorney replied, "Well, I said, 'Bill, if you want a will, I will be willing to draw it if it is a short will; but if there is anything like a lengthy will that you want I am not in a position to do it because I don't employ a stenographer.' He said, 'That is all I want; I just want a short will.'

"Shortly thereafter decedent said, 'I have a brother and I have a nephew and I have a niece, Bud and Gwen.' He never referred to them as Reese and Gwendolyn. I knew them fairly well, not as well as I knew the brothers. And he said, 'I take it this way—I went through hell and dynamite with my brothers to make this money and I am going to leave the money to my brother Dave; both Gwen and Bud have received over a million dollars from the Llewellyns'; and he said, 'That ain't hay is it?' ''

Thereupon, Attorney Mueller made a short memorandum

in pencil and told the decedent that it would be necessary to have a witness to the will. The decedent suggested Sheriff Biscailuz but the attorney suggested it was pretty late in the day to obtain the presence of that official. Decedent then suggested Mr. Arthur Brown, an old friend whose wife was a patient in the hospital. Thereupon, Attorney Mueller went in search of Mr. Brown and when the latter was found he expressed a willingness to act as a witness. Attorney Mueller then went downstairs and wrote out the will in longhand on a form which he had previously secured. Upon the conclusion of this task he was unable to locate Mr. Brown, so he asked his wife, who had known the decedent over a long period of years, whether she would agree to act as a witness to the will. She acquiesced and accompanied her husband upstairs, where they both chatted with decedent for a few moments, and then Attorney Mueller handed decedent the will he had written out in longhand. After signing the same, decedent stated he was not satisfied with his signature and asked the attorney if it would be too much trouble for him to come back and draw another will. Decedent stated at that time he might want to make another change. Attorney Mueller agreed to this suggestion and thereupon with his wife left decedent's room.

On the afternoon of Monday, March 12, Attorney Mueller took a taxi to downtown Los Angeles and arrived at the hospital a little after 4 o'clock. Upon arrival at the hospital, he met the appellant "downstairs someplace, either in the reception room or someplace." The attorney asked appellant to ascertain if Mr. Arthur Brown was in the hospital visiting his wife, and thereupon went upstairs to see the decedent. Upon arrival in the decedent's room he found the latter sitting by the window smoking a cigarette. Decedent, when asked if he wanted to make any change in the will drawn three days previously, replied, "No, it is just the same, I want Dave to have everything." Attorney Mueller then went downstairs, where he located Mr. Brown in the company of appellant in one of the reception rooms. Accompanied by Attorney Mueller, Brown thereupon went upstairs, where the attorney took a printed form, similar to the one he had filled out on March 9, filled it out in the presence of the decedent and Mr. Brown. He then read the will out loud and handed it to the decedent. After decedent had read the will, Attorney Mueller said, "Is this the way you

want the will, Bill?," to which the decedent replied, "Yes, that's the way I want it." The document was executed; decedent told Attorney Mueller to put the same in the latter's safety deposit box. This is the will involved in this litigation.

In the course of the conversation preceding execution of the will, decedent again brought up the fact that respondents had received over a million dollars from the Llewellyn family, adding, "I think that is enough for young people, don't you think so?"

It further appears, from the record, that either on this occasion or on the afternoon of March 9, decedent had this to say with respect to the extent of his property: "Now you know, Oscar (referring to Attorney Mueller), I haven't a large estate to leave; my estate is comparatively small if you are going to compare it to Bud's and Gwen's (respondents herein), . . . Theirs is very large and mine is comparatively small."

There was also testimony reflected by the hospital records that on March 8, at 11:45 p. m., the patient (decedent) was "cursing and swearing and seems very dissatisfied." On March 9, at 12:45 a. m., one and one-half grains of nembutal were administered. At 1:30 a. m. decedent was awake and "talking mean and demanding," and that he would not keep the binder and dressing on his abdomen. At 3 a. m. the patient was restless and talking a lot. At 3:40 a. m. he was calmer and asking for his brother, appellant herein. At 6:30 a. m. appellant visited his brother. At 12 o'clock noon decedent awakened or was awakened for lunch and seemed relaxed and comfortable. At 12:30 p. m. he fell asleep, and at 3 p. m. was still asleep. The hospital records contain a notation that at 5 p. m. "patient's brother and Mr. Mueller here for about forty minutes." This was the day on which the will of March 9 was executed. We mention the circumstances surrounding the execution of both wills, although only the will of March 12 was offered for probate, because both wills were practically identical. Respondents direct our attention to the fact that while appellant testified that on March 9 he was not in his brother's room at any time while Attorney Mueller was there, Mr. Brown, one of the subscribing witnesses, testified that when he went to decedent's room to act as a witness to the will "Dave Llewellyn (appellant) took me in there." This testimony, argue respondents, entitled the jury to disregard the tes-

timony of appellant and Attorney Mueller that the former was not in his brother's room when the will of March 9 "was discussed or signed" and warrants an inference by the jury that appellant was also in the room and participated actively in the execution of the will of March 12, here under attack.

In urging a reversal of the judgment herein, appellant asserts:

"1. There is no substantial evidence to sustain the specific finding of the jury that the decedent was not of sound and disposing mind and memory at the time he executed the will in question.

"2. There is no substantial evidence to support the specific finding of the jury that the instrument offered for probate as the last will and testament of the decedent was procured by and through the undue influence of the proponent, David E. Llewellyn."

When an attack is made upon a verdict rendered in a will contest on the ground that it is not supported by substantial evidence, the province of an appellate tribunal is the same as in any other civil case. And the power of a reviewing court "begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. And when two or more inferences can reasonably be deduced from the facts, a reviewing court is not authorized to substitute its deductions for those of the triers of fact" (*Estate of Russell*, 80 Cal.App.2d 711, 715 [182 P.2d 318]). Since our duty begins and ends with a determination of whether there is adequate evidence to support the findings of the jury and the judgment of the trial court, we shall not attempt to analyze the evidence given by witnesses produced on behalf of the appellant. Because we are authorized only to consider the evidence and not to weigh the same, it would be but an idle act to attempt a review of evidence in conflict with that offered by respondents. The weight of evidence and the credibility of witnesses are functions of the jury, which had the right to accept as true all of the evidence in support of the claims of respondents and to reject all of the evidence offered in behalf of appellant which was in any way contradictory to that of respondents, or otherwise impeached.

Adhering to the rules just announced, we come now to a consideration of such evidence as was offered in support of the verdicts and judgment predicated thereon, to determine therefrom whether it is of such substantial character as to justify the verdicts and judgment.

There was testimony that decedent was very much devoted to his deceased sister, the mother of contestants, one of whom, Mrs. Cheesewright, testified, "My Uncle Will adored my mother." And that after the death of her mother decedent would tell the witness, "Little dear, you mean so much to me and you take your mother's place." The witness Mary Somers Pfaff, employed by the Llewellyn family, other than appellant, in a confidential business capacity, testified that decedent was "devoted" to his sister. With reference to the relationship existing between decedent and respondent Reese L. Milner, the latter's sister testified that, except for short periods when decedent would "become very provoked with my brother, and then the next hour or the next day he would be feeling very solicitous about him again," that the relationship between the two "was almost a father-and-son relationship."

Following the death of the mother of respondents in 1942, decedent took his nephew Reese Milner on short trips, and as late as November, 1944, spent some time with him at a ranch. Mrs. Pfaff testified that the decedent "was very proud of Mr. Milner, the fact that he was as successful in business as he was and spent so much time taking care of his business." This witness also testified that on several occasions while decedent was in the hospital he told her that "Mr. Milner, or Bud (one of respondents) and David Llewellyn were both pestering him to find out what was in his will . . . but he was not going to tell anybody." That very often decedent said, ". . . that Reese Milner was grasping but Dave (appellant) was much more grasping." Barclay Shields, employed by the decedent from 1941 to 1943, as a nurse and companion, testified that the testator's relationship with his nephew Reese Milner "was a combination of very friendly and very stormy at times." When asked to explain, the witness said, "Well, Mr. Llewellyn was very fond of Bud, but he would become irritated quite often because Bud didn't or would not stay home and play dominoes and he promised to do something and didn't do it. That was the stormy part of it." The witness also stated that this

attitude of irritation toward Reese Milner did not last "very long," and that after it had passed, decedent "would be very proud."

Asked to explain what decedent said to him, indicating that he was "very proud" of Reese Milner, the witness replied, "Well, it was sort of like a father talking about his son, as near as I could say— proud of his build or what he did in business, or things of that kind." The witness also testified that the attitude of Reese Milner towards his uncle was "very friendly." We find no contradiction in the record of the testimony given by the witness Shields who epitomized the attitude of decedent towards his niece, respondent Gwendolyn Cheesewright, as follows: "She was like a daughter. He (decedent) had known her since she was a little baby and been in the house with her"; that decedent always referred to his niece as "a little dear," saying that she was as nice as her mother whom he "dearly loved."

Also introduced into evidence by respondents were two former wills executed by decedent, entirely inconsistent with the wills of March 9 and March 12, 1945. The first was a holographic will dated October 1, 1942; the circumstances of its execution are not disclosed. By its terms Reese Milner was appointed executor, without bond. The decedent's diamond ring was bequeathed to Reese Milner and the balance of the estate was divided equally between him and his sister, Mrs. Cheesewright, with a provision that if either of them predeceased the testator, the entire estate should go to the survivor.

The second will, dated March 11, 1943, was drawn by Attorney Paul Nourse, at the request of the testator, in the former's office, after a full discussion with the testator as to the various items of his property and what disposition he desired to make of the same. This will bequeathed to appellant herein the testator's diamond ring, his shares of stock in the Recreation Gun Club and $10,000 in United States defense bonds. It gave to Barclay Shields, the aforesaid nurse and companion of the testator, the latter's automobile, and to Theresa Hoelvl, described as "the faithful servant of my sister and myself for more than sixteen years" the sum of $1,000. The residue of the estate was divided equally between respondents herein. Mrs. Pfaff, confidential secretary of the Llewellyn family, was appointed executor, without bond. This will of March 11, 1943, contains the fol-

lowing statement, "I make the division of my property be-
tween my brother and my nephew and niece above mentioned
for the following reasons: I have a great affection for my
brother, but he is amply provided for and while younger
than I am will not have need of any gift from me, and while
my nephew and my niece are amply provided for through
inheritance from others, they were born and raised in the
household while I was a member and have been as close to
me as if they were my own children."

Respondents concede that on March 11, 1943, when this
will was executed, the testator was of sound and disposing
mind and not acting under duress.

Thus far we have devoted ourselves to testimony which
presents a picture of the relationship existing between the
testator, appellant and respondents herein, something of the
circumstances surrounding the execution of the will of March
9 and the one here under attack, dated March 12, 1945, and
in general, the physical condition of the testator when he
entered the hospital and during his stay therein.

We shall now give consideration to the testimony which
respondents earnestly assert possesses sufficient substantiality
to support the specific finding of the jury that the testator
was bereft of testamentary capacity at the time he signed the
will of March 12, 1945, which was denied admission to pro-
bate.

The hospital records pertaining to decedent were intro-
duced into evidence by respondents. They included notations
made by the attending physicians and the bedside notes made
by the nurses. We quote from some of such records to which
respondents direct our attention. These records all refer to
dates in March, 1945:

| Report of Medicine Given | Nurses' Bedside Notes | Doctors' Records |
|---|---|---|
| 8:30 P.M. Seconal | March 3rd | |
| 1:45 A.M. Seconal 8:00 P.M. Nembutal | March 4th 7:00 A.M. Makes remarks that are completely irrational— "Did not stay to dance" (Nickerson) 3:00 P.M. Mind more confused. (Nickerson) | Restless and con- fused after seconal —to try nembutal (Hawkins) |

| Report of Medicine Given | Nurses' Bedside Notes | Doctors' Records |
|---|---|---|
| | March 5th<br>3:15 A.M. Patient confused Sleeping on nembutal (Nickerson) | |
| | March 6th<br>3:30 P.M. Somewhat confused | |
| | March 8th<br>11:45 P.M. Patient cursing and swearing; seems very dissatisfied. (Anderson) | March 8th<br>Abdomen full of fluid. |
| March 9th<br>12:45 A.M.<br>Nembutal 1½ gr. | March 9th<br>1:30 A.M. Patient awake and talking mean and demanding. Would not keep binder and dressing on abdomen. (Anderson) | March 9th<br>Pretibial oedema and swelling of scrotum; also set oedema lower abdominal wall. 20 c.c. completed and catheterization attempted c̲ success. |
| | 3:00 A.M. Restless and talking a lot, up on chair, smoking. (Anderson) | |
| March 9th | 3:40 A.M. Patient is much calmer, asking for brother. (Anderson) | |
| | 6:30 A.M. Visiting with brother. (Nickerson) | |
| 9:30 A.M.<br>Has slept soundly until now. Turning and jerking in sleep.<br><br>9:35 A.M.<br>Patient is still sleepy but in good spirits.<br><br>12 M.<br>Awakened for lunch. Fair appetite. Relaxed and comfortable. | | |

| Report of Medicine Given | Nurses' Bedside Notes | Doctors' Records |
|---|---|---|
| March 9th (cont.) | March 9th (cont.) | March 9th (cont.) |

**Report of Medicine Given**

12:30 P.M.
Is tired and sleepy. Wants to go to bed again. Sleeping at once.

1:20 P.M.
Slept nearly all day.

3:00 P.M.
Patient sound asleep

9:00 P.M.
Phenobarbital

March 11th
12:40 A.M.
Awake, having discomfort around swollen scrotum.

**Nurses' Bedside Notes**

5:00 P.M. Patient's brother and Mr. Mueller here for about 40 minutes.

(Will of March 9 executed)

March 10th
7:30 P.M. Phenobarbital for nervousness.

11:00 P.M. Patient seems distressed or rather worrying about something.

11:25 P.M. Mind quite clear.

March 11th

2:45 A.M. Awake. Seems not so depressed.

7:00 A.M. Pulse a little weaker than usual.

8:20 A.M. Is very groggy. (Nickerson)

3:30 P.M. Brother visiting.

March 12th
12:20 A.M. Sleeping short intervals

**Doctors' Records**

Liver remains about the same size but there has been a change. It is definitely more nodular and rough. (Hawkins)

| Report of Medicine Given | Nurses' Bedside Notes | Doctors' Records |
|---|---|---|
| March 12th (cont.) | March 12th (cont.) 1:45 A.M. Awake. Discomfort in scrotum and rectum. | |
| 2:50 A.M. Phenobarbital. | | |
| | 10:00 A.M. To bed. Brother visits. | |
| | 3:00 P.M. *Has had good day generally,* seeming somewhat weaker at times. | |
| | 4:00 P.M. *Mentally very clear.* | |
| | 4:30 P.M. Mr. Mueller and Mr. Brown with patient. (Will under attack executed) | |
| | 5:00 P.M. Brother visited for 20 minutes. | |
| | March 13th | |
| 6:30 A.M. "Did not sleep hardly any all night" (Anderson) | | |

There was also testimony that after his admission to the hospital on March 3, 1945, and prior thereto, the testator was suffering considerable physical pain practically all the time; that he found it increasingly difficult to sit up. Respondent Gwendolyn Milner Cheesewright testified that when she saw the testator in the hospital his mental condition was "considerably worse . . . his memory was poorer, he seemed much more ill"; that on different occasions he "thought he was on a ship"; that from the time he entered the hospital the testator "seemed to be disoriented the greater part of the time."

Mrs. Pfaff, the confidential employee of the Llewellyn family, testified that during the latter part of 1944 and the early part of 1945, the testator "lost a lot of ground both physically and mentally," that "he was very hazy about a great many things; his orientation was very bad; he was very weak," that "his memory was very bad for a long period, the last two or three years before his death." When asked to give the jury examples of what she based the foregoing observation upon, the witness testified, "Almost every time

I went to the hospital to see Mr. Llewellyn, he would ask where I was living at that time and what car I was driving. He always seemed surprised when I told him I was still driving the same car and still living in the same place.

"Q. What about his memory of stocks and things? Do you recall anything about matters of that kind?

"A. Yes, whenever he would look at the operations statement and see that he had any dividends received from any stocks he was nearly always surprised at the dividends he received. He was interested in very few of the items except the Recreation Gun Club. He generally remembered he owned that. He was very much interested in the bank balance. He always asked about what his bank balance was: and he was interested in his government bonds; but otherwise, he did not remember he owned any stock or didn't remember the names of any stocks."

This witness saw the testator two or three times a week while he was in the hospital. On March 10, 1945, which was two days before execution of the will here under consideration, the witness took to the testator his income tax return for his signature and testified that on that occasion he was "somewhat confused about it. I really don't think he understood his income tax return, he knew that it was an income tax return. He was quite willing to sign it if I told him. . . ."

When asked with reference to the condition of the testator on March 10, 1945, "How would you describe Mr. Llewellyn at that time?" the witness replied, "I would say that Mr. Llewellyn was a tired, sick, senile old man." When asked on cross-examination to explain what she meant by describing the testator as a "senile old man" Mrs. Pfaff replied, "I think he was in his second childhood." Pressed for a further explanation, she said, "He was very childish about many things." Interrogated further on cross-examination as to whether "it was his age that to your mind makes senility, or what is it?" the witness replied, "It was mostly mentality, I believe. From the time I knew Mr. Llewellyn in 1929 until his death, he never was vigorous mentally or physically I could see. The last few years of his life he deteriorated quite rapidly."

This witness further testified that on March 7, 1945, she presented to the testator for his signature a power of attorney made out to the respondents herein. This instrument was prepared by an attorney upon the suggestion of the witness,

who testified, ". . . I felt he would not be able to attend to his affairs." When the power of attorney was presented to the testator, the witness testified, he did not sign it, "he asked me if I would bring it the next time I came, he would be glad to sign it. He wanted to think about it." The witness further testified that the testator did not read the document but that she explained to him what it was, that it was never signed, that "I did not want him to sign it. I did not urge him to; he did not seem to be interested in it."

Marguerite Tracy, a registered nurse, first met decedent at the hospital on April 10, 1945 (approximately one month after execution of the contested will of March 9, 1945). She remained on the case up to the time of the testator's death. Her hours of duty were from 7 o'clock in the morning until 3:30 in the afternoon. The witness gave it as her opinion that decedent was confused after he had been given certain drugs and that this confusion would last for from 12 to 16 hours; that "this confusion caused the decedent to be disoriented, he did not know where he was and he would think he was some place else"; that he would not recognize his own personal belongings and would be suspicious of people who came to see him, even though he knew them. According to the witness, the decedent often thought he was on an ocean voyage and referred to the room as a ship. On other occasions, he thought he was setting the bed on fire while he was smoking a cigarette and the nurse would have to show him that the cigarette was not lighted. In the opinion of the witness "he seemed to have illusions about that quite a lot."

According to Miss Tracy, her patient was "sort of childish about his personal effects; for instance, he had all his cigarettes counted and we would have to account for everything that was his; that it had to be in a certain place, he was more or less, I would say, childish about his personal things." When asked for examples of these alleged "childish" habits, the witness stated that when decedent went into the bathroom she had to bring him his cigarettes and put them right beside him where he could see them. Because his teeth were made of gold, he was likewise concerned as to them and he was also in the habit of saving "every little thing, string or bits of paper that came into the room." When decedent's meals were brought to his room, he would keep the small piece of cardboard supporting the menu card, even though it was just a blank piece of paper.

As to decedent's memory, the witness testified that the same was very poor; that he could not remember things that happened at present or the day before as well as he could remember the long past. His memory was good as far as 25 or 30 or even 40 years ago was concerned, but for the present he was confused.

Clara McElroy was a registered nurse who first met the decedent on June 17, 1945, when she went on the case. She testified that the decedent would have spells of being irritable and that he was confused and disoriented on several different occasions. He would often question the witness as to whether he was in his right room, and one month after she went on the case decedent had the impression that he was taking a sea voyage and wanted to be sure he would return to the same room when he came back from that trip. Oftentimes, according to the witness, decedent would wake up and think there was a cigarette burning his bed and she had quite a time convincing him to the contrary.

■■ Except for the hospital records, all of the testimony produced in behalf of the contestants and respondents, as hereinbefore narrated, concerned the condition of the testator before and after the actual date and time when the will was executed, and the same was admissible only insofar as it tended to show the testator's condition at the very time the will was made. ■■ As was stated by this court in *Estate of Russell*, 80 Cal.App.2d 711, 721 [182 P.2d 318]: "Before a solemnly executed will may be set aside, the claimed infirmities of mind or body must be shown to have had a direct bearing on the testamentary act, and the evidence must establish the fact that the deceased devised or bequeathed her property in a manner which, except for the claimed infirmities, she would not have done. (*Estate of Schwartz*, 67 Cal.App. 2d 512, 519 [155 P.2d 76], and cases therein cited.)"

The only evidence offered by respondents as to the physical and mental condition of the testator on the afternoon of March 12, 1945, when the will now under consideration was executed, is that furnished by the hospital records, from which we again quote the following:

"3:00 P.M. *Has had good day generally,* seeming somewhat weaker at times.

"4:00 P.M. *Mentally very clear.*

"4:30 P.M. Mr. Mueller and Mr. Brown with patient.

"5:00 P.M. Brother visited for 20 minutes."

Thus it will be seen from the hospital records offered in evidence by respondents themselves, that one-half hour before the execution of the testamentary document the testator was "mentally very clear." To this may be added the fact that while at that time the decedent was hospitalized, he was not bedridden, but would sit up at times practically daily.

■ The following language used by this court in *Estate of Russell, supra,* 719, seems peculiarly applicable to the facts of the case now before us:

"While in the instant case, the testatrix was in feeble health, suffering from disease, aged and infirm, these facts are not sufficient of themselves to establish testamentary incapacity unless it be shown by a preponderance of the evidence that her condition of mind and body *at the time of the execution of the will* was such that she was unable to understand the nature and situation of her property and the disposing of it intelligently. In other words, it must be shown that her weakened and enfeebled condition had a direct influence upon the testamentary act. Section 20 of the Probate Code empowers every person of sound mind, over the age of 18 years, to dispose of his separate property by will. And the property being his to dispose of as he wills, he is not called upon to consult or satisfy the wishes or views of juries or courts. The presumption is always that a person was of 'sound mind' at the time of execution of his will, and the burden therefore always rests upon the contestants to show affirmatively and by a preponderance of the evidence, the incapacity of the testator and the further fact that, because of the mental or bodily infirmities with which the testator was afflicted, he devised or bequeathed his property in a way which, except for the existence of the aforesaid infirmities, he would not have done."

And again in *Estate of Rich,* 79 Cal.App.2d 22, 30 [179 P.2d 373], the rule was stated by this court as follows:

" 'Every mental departure from the normal will not destroy a testamentary disposition, otherwise valid, of the testatrix' estate. It is not the rule of law that no person who is insane may make a valid will. The real rule is that the will of a person, who by reason of insanity is incapable of making valid testamentary disposition of his estate, shall not be upheld (*Estate of Chevallier,* 159 Cal. 161 [113 P. 130]; *Estate of Wasserman,* 170 Cal. 101 [148 P. 931]).'

''The same case is authority for the statement that in order to invalidate a will mental derangement must be insanity in one of two forms: '(1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion.' And furthermore, it must be shown that the abnormality of mind had a direct influence upon the testamentary act. Conceding that the testatrix understood her physical condition and was greatly worried, nervous and disturbed about it, such worry and concern was but natural and not an evidence of mental infirmity. In the instant case there is not even a suggestion that the decedent was the victim of any hallucinations or delusions.''

Respondents urge that no determination of the testator's mental capacity can be predicated upon what he said or did or failed to do on March 9 or March 12th, 1945, or on any given day or at any given hour. That he did not suffer at some particular moment a mental collapse, but rather experienced a long period of mental limitation, followed by a period of some months (just prior to his entry into the hospital in early March of 1945) during which mental and physical deterioration was very definite and rapid, and that finally his condition culminated in a state of such irresponsibility that on March 9th, and March 12th, he did not have testamentary capacity. But this contention is in contravention of long and well established principles of law, which hold that testamentary incapacity must be shown by a preponderance of the evidence to exist *at the time of the execution of the will,* and that any infirmities of body or mind had a direct influence upon the testamentary act. The question is not what *may* have been the testator's mental state at the time of the testamentary act, but *what it actually was.* It is true of course that evidence of the condition of the testator's mind before and even after the date of the testamentary act was admissible, but it assumes importance only insofar as it bears upon that condition at the very time of the execution of the will. As was said by this court in *Estate of Schwartz,* 67 Cal.App.2d 512, 520 [155 P.2d 76]:

''What others than the testator may think as to the justice or injustice of a will is simply a matter of opinion and therefore, before the law will permit judges or juries to make disposition of a decedent's property irrespective of his or her

desires, substantial evidence is required to show lack of testamentary capacity at the time of the execution of the will.''

Again, in *Estate of Johanson,* 62 Cal.App.2d 41, 50 [144 P.2d 72], it was stated:

''Peculiar and unusual conduct and the possession of false beliefs frequently accompany physical afflictions, but something more than that is required to render one incapable of making a valid will. The right to dispose of one's estate by will is not confined to those whose mental powers are unimpaired and whose conduct and beliefs are normal and, from a medical viewpoint, sane. Testamentary capacity is not destroyed by mere false beliefs or departure from normal thought or action, nor even by insane delusions or hallucinations that do not bear directly upon and influence the terms of the will.''

The evidence in the case now engaging our attention is very much weaker than that held insufficient to justify the setting aside of the wills in other cases decided by the appellate tribunals of this state. For support of this statement it is necessary to do no more than to cite the following authorities: *Estate of Perkins,* 195 Cal. 699 [235 P. 45]; *Estate of Clark,* 170 Cal. 418 [149 P. 828]; *Estate of Chevallier,* 159 Cal. 161 [113 P. 130]; *Estate of Purcell,* 164 Cal. 300 [128 P. 932]; *Estate of Casarotti,* 184 Cal. 73 [192 P. 1085]; *Estate of Finkler,* 3 Cal.2d 584 [46 P.2d 149]; *Estate of Garvey,* 38 Cal.App.2d 449 [101 P.2d 551]; *Estate of Schwartz,* 67 Cal. App.2d 512 [155 P.2d 76]; *Estate of Kendrick,* 130 Cal. 360, 363 [62 P. 605]; *Estate of Rich,* 79 Cal.App.2d 22 [179 P.2d 373; *Estate of Russell,* 80 Cal.App.2d 711 [182 P.2d 318].

 The presumption always is that a person was of ''sound mind'' at the time of the execution of his will, and the burden therefore always rests upon the contestants to show affirmatively, and by a preponderance of the evidence, the incapacity of the testator, and the further fact that except for alleged infirmities of mind or body, he bequeathed his property in a manner that he otherwise would not have done.

 Giving a consideration to all of the foregoing evidence introduced by contestants and respondents, we must hold that it falls far short of constituting what the law regards as a rebuttal of the presumption of testamentary capacity at the time of the execution of the will, the existence of which is destroyed only when by *substantial* evidence it is shown

that a testator was unable to understand and carry in his mind the nature and situation of his property, his relations to his relatives and those around him, incapable of understanding the act he is performing, and the relation in which he stands to the objects of his bounty if any.

We shall now proceed to a review of the evidence which respondents urge supports the specific finding of the jury that the instrument dated March 12, 1945, offered for probate was the product of the undue influence of appellant. In narrating such evidence, we shall not repeat testimony hereinbefore set forth, but shall have the same in mind and refer thereto in applying the law to the facts relied upon by respondents to support the last above-named specific finding of the jury.

Other than such evidence as has been hereinbefore recited, we find in the record testimony that appellant, decedent, and their sister Mrs. Milner, owned property in what was called the Santa Monica Syndicate, in connection with which appellant advised with his brother, the decedent. The sister, Mrs. Milner, died early in 1942, and prior to her death appellant had not been active in the affairs of his brother. Some time in 1942, appellant sold decedent's shares of stock in a gun club. During the latter part of 1942, decedent told Barclay Shields, his nurse and companion, that appellant "was there with a will and asked him to sign it and he told me he refused." That in the early part of 1943, decedent told the witness that "he wanted to make his will the way he wanted it and he did not want any interference or anything of that sort." "That Dave (appellant) and Bud (one of respondents) were both after him to change his will," but that "he was going to make a will of his own." Respondent Mrs. Cheesewright testified that following the death of her mother (Mrs. Milner, sister of decedent and appellant), and particularly from about December 10, 1944, until decedent entered the hospital on March 4 of the following year, the latter was "unhappy and disturbed"; that she saw him approximately once a week at his Berkeley Square residence, at which times he would say to her, "Little dear, Dave (appellant) and Bud (one of respondents) keep bothering me all the time about my will and about my property."

Mrs. Pfaff, confidential secretary of the Llewellyn family, testified that toward the end of the year 1942 and the early part of 1943, the decedent stated to her, "that both David Llewellyn and Mr. Milner were pestering him about his

will; he said they were only interested in his money." That on one occasion when decedent took her with him to his safety deposit box to look at his bonds and coupons he said, ". . . that Mr. Milner and Mr. Llewellyn were both pestering him about his will and wanted to know what was in it, and wanted to know what disposition he made of his property"; that "they both felt that they should— that he should make a disposition that was favorable to them." That decedent also told her that appellant "felt that he should change some of his policies at least in favor of his (appellant's) daughter."

There was also testimony that on October 30, 1944, appellant met his brother, the decedent, at the Jonathan Club and took him to the office of the Equitable Life Assurance Society where appellant told representatives of the company that decedent wished to change the beneficiaries from respondents herein to appellant's daughter Dorothy. That the company's representative made out the change of beneficiary forms and decedent executed them in the presence of appellant. Subsequently, these changes were countermanded by decedent. That in the latter part of October, 1944, appellant and decedent went to the office of an insurance broker and there discussed a change in decedent's insurance. That two or three days later, at decedent's request, the insurance broker went to the Jonathan Club where he was told by the decedent to change two of his insurance policies so as to make appellant's daughter Dorothy the beneficiary. That the policies were so changed. Prior to this change, the beneficiaries were respondents herein. That subsequently, however, decedent requested that respondents be reinstated as the beneficiaries. That when decedent received statements of his finances and assets from Mrs. Pfaff he would discuss them with his brother.

That appellant, decedent and other members of the family had an interest in what was known as the Vernon property, which consisted of about 25 acres. That appellant had a 5/28 interest and decedent had the same. In February of 1944, appellant bought his brother's 5/28 interest in the 25 acres for $6,000 and in the same month sold 3/65 acres of the property, through which appellant realized $4,462 on the interest purchased from his brother.

That in January of 1945, 14.898 acres of this Vernon property were sold and, on the interest which appellant

had acquired from decedent, he realized through such sale about $41,000, indicating that in about 11 months after he had purchased his brother's interest for $6,000, appellant realized thereon, through the two sales, in excess of $45,000. After the foregoing two sales, 6.86 acres of the Vernon property remained unsold. This remainder was subsequently sold for a price that gave appellant $17,075 from the interest which he had acquired from his brother. That through these three sales appellant obtained about $62,540 for the property he had acquired from his brother, the decedent, for $6,000.

That appellant, in response to questions by his counsel, testified that when the deed from decedent to appellant covering the former's interest in the Vernon property had been prepared, it was executed at the Citizens National Bank while appellant and his brother were with the president of the bank; that appellant read the deed to his brother in the presence of the bank president and that decedent was willing to sign the deed. That on cross-examination appellant admitted that the deed was drawn by his son-in-law (an attorney); that he merely took decedent to the bank and with him, talked to the president and that, although appellant had the deed in his pocket while he and his brother were talking to the bank president, and although appellant knew the bank president had been decedent's banker for a great many years, there was no discussion of the transaction with him and that decedent obtained no advice from his banker.

There was also testimony that from the time decedent became quite ill in January, 1945, until he was hospitalized on March 3 of that year, appellant visited his brother "a great many times." According to appellant's own testimony, from March 3, 1945 to March 15, 1945, while his brother was in the hospital, he visited him two or three times a day. This was the period during which the testamentary instruments of March 9 and March 12, 1945, were executed.

There was testimony that some time about June, 1945, which was subsequent to the execution of the will here in question, appellant went to the hospital and asked decedent for the keys to his "lock box," stating that he desired to "see if he (decedent) didn't have the deeds to the property, because oil had been discovered, and it would mean a lot of money to William Llewellyn (the testator)", that he (appellant) "would like to get in there and see what stock or

deeds he (decedent) had because if he did not maybe Bud (one of the respondents) would." That decedent replied, "No, you don't get those keys, Dave; later on when I am out of the hospital, if you want to see what is in the lock box I will go down with you." That shortly before the testator's demise, appellant came to the hospital one morning, at which time the decedent was "really in a semi-conscious state" and asked the nurse on duty if she would get the keys to decedent's lock box, that the latter had asked him to take them and wanted him to have them. That both the nurse and appellant talked to the decedent, the nurse asking him if he wanted appellant "to have his keys and watch," to which decedent replied, "No."

The physical and mental condition of the testator, both before and while at the hospital, upon which respondents rely to support their claim of undue influence, has heretofore been narrated and will not now be repeated. Nor will we now refer to the testimony concerning decedent's relationship with the contestants, all of which has been hereinbefore recited, other than to observe that as to contestant Milner, the evidence does not reflect that deep and abiding affection which decedent at all times, according to the record, cherished for his niece, one of respondents herein, Gwendolyn Cheesewright. The inconsistencies of the wills of October 1, 1942, and March 11, 1943, with the testamentary documents of March 9 and 12, 1945, have also been heretofore detailed. Statements made prior to and inconsistent with provisions contained in the documents executed on March 9 and 12, 1945, have also heretofore been referred to.

There was also testimony as to the testator's physical and mental condition during the time commencing about a month after the execution of the wills of March 9 and 12, 1945, and the time of his death. We fail to perceive the value of this evidence except insofar as it may tend to prove the infirmities of decedent prior to and at the time he performed the testamentary act here in question, and thereby throw some light on the likelihood that his mind was subjugated to the will of appellant. This comment we make because respondents themselves insist that the testator's mental condition was a progressively deteriorating one. The testimony in question was that about April, 1945, decedent was being given phenobarbital, described as a hypnotic drug, but according to the testimony of Marguerite Tracy, a nurse

who went on duty April 10, 1945, "when I went on the case we were getting him away from hypnotics." Asked as to the effect of hypnotic drugs, the witness stated, "they tended to keep him confused . . . he would get a 'hangover' from them, and he was more or less in a confused state" for from 12 to 16 hours after the drug was administered. That when decedent was in such a "confused state," he was often disoriented, and thought he was in a different room. Other testimony given by this witness has heretofore been set forth as well as that given by another nurse, Miss McElroy.

There was also testimony given by another attending nurse that decedent "never seemed to greet Dave (appellant) with as much friendliness as he did his niece and nephew (respondents)." The decedent spoke of his brother, appellant herein, as "Oh Dave is grasping," and that he was "tight," "he is stingy."

We are also directed by respondents to testimony that Doctor Crispin, one of decedent's attending physicians, had told Mrs. Pfaff about June 1, 1945, that decedent "had the nurses and doctor's worn out, that he had to discharge them all that morning, stating that he had his bag all packed and was leaving the hospital" and that Doctor Crispin had stated to her that the decedent "was in very bad condition and not responsible for his actions"; that this conversation occurred about June 1, 1945, subsequent to the execution of the will. It should, however, be observed that when testifying as a witness, Doctor Crispin was asked, "from your observation of William Llewellyn, in your opinion, during the month of March, 1945, and particularly on the 12th of March, 1945, would you say that he was of sound mind?" to which the physician replied, "I would. It did not occur to me that he was not, or that there was anything out of the way. He apparently was able to know what he had in mind and what he wanted to do on everything that came up in connection with him."

In support of their claim that appellant was active in procuring the execution of the challenged testamentary document, respondents direct our attention to testimony that over a period of several years he had suggested to decedent that he change the terms of his will; that from the time decedent entered the hospital on March 3, 1945, until March 12, 1945, appellant visited him two or three times a day, notwithstanding that the testator was suffering great physical pain and at times was under the influence of hypnotic

drugs; that appellant was instrumental in having the attorney who prepared the documents of March 9 and 12, 1945, go to the hospital; that appellant suggested Arthur Brown as one of the witnesses and took him to the testator's room; that appellant obtained copies of both the aforesaid wills.

The authorities in this state are numerous and harmonious to the effect that however unnatural a will may appear to be, or however much at variance with expressions by the testator as to his intentions with regard to relatives or the natural objects of his bounty, it may not be held invalid on the ground of undue influence unless there be an actual showing of some sort of pressure which overpowered the mind and mastered the volition of the testator at the very moment of execution of the will (*Estate of Clark,* 170 Cal. 418, 424 [149 P. 828]; *Estate of Carithers,* 156 Cal. 422, 428 [105 P. 127]; *Estate of Gleason,* 164 Cal. 756, 765 [130 P. 872]; *Estate of Lavinburg,* 161 Cal. 536, 543 [119 P. 915]). However, there is a well-established exception to this settled general rule, upon which respondents rely, to the effect that where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him to show that the testamentary document was not induced by coercion or fraud. When proof of the existence of a confidential relationship between the testator and such a beneficiary, coupled with activity on the part of the latter in the preparation of the will, is offered, a presumption of undue influence arises therefrom (*Estate of Higgins,* 156 Cal. 257, 261, 262 [104 P. 6]).

The question first arises, was there a confidential relationship existing between the testator and his brother, appellant herein? Confidential relationships are thus defined in *Estate of Cover,* 188 Cal. 133, 143 [204 P. 583]:

"Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another." And, in *Herbert* v. *Lankershim,* 9 Cal.2d 409, 483, 484 [71 P.2d 220], in dealing with the question of a confidential relationship, the court approves of an instruction which contains, among other statements, the following:

"The law defines a confidential relation as any relation existing between parties to a transaction wherein one of the

parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another.''

While asserting, and we think correctly, that blood relationship is an important and material circumstance in considering the question whether in fact, a confidential relationship exists, respondents concede that the relationship existing as here, between brothers, is not in itself a fiduciary relationship (*Odell* v. *Moss*, 130 Cal. 352, 356 [62 P. 555]).

We are persuaded that the evidence proffered by the respondents in the case at bar affirmatively and effectively establishes the fact that no such relationship existed between the testator and his brother. In his brief, Reese Milner states ''that Dave (appellant) did not stand very high in Bill's (testator) esteem.'' The record is replete with testimony offered by respondents that both before and after the execution of the will here under consideration, decedent had characterized appellant as ''stingy,'' ''greedy'' and ''grasping.'' There is also testimony that on one occasion appellant presented to the testator a will but the latter refused to sign it, and when appellant requested decedent to give him his ''lock box keys'' the latter refused so to do, stating that when he recovered from his illness he would take appellant with him to the bank and show him certain deeds which appellant expressed a desire to see. There is no evidence that at any time appellant handled decedent's business affairs, which is more than can be said of respondent Milner who handled certain investments for him. The evidence negatives any inference that such trust and confidence was reposed by decedent in the integrity and fidelity of his brother as would establish the existence of a confidential relationship between them. However, in the absence of a confidential relationship between decedent and his brother, if the evidence shows that the instrument here under attack represented the will of the appellant and not the wish or the desire of the testator, it must be rejected. We, therefore, proceed to a discussion of the sufficiency of the evidence to support the specific finding of the jury that the will of March 12, 1945, was executed while the testator was acting under the undue influence of his brother (appellant herein).

Before there is imposed upon the proponent of a will the obligation of presenting evidence of volition, and before the question as to undue influence becomes one of fact for

determination by a jury, there must be evidence, the probative force of which establishes (1) the relations between the one charged with exercising the undue influence and the decedent affording the former an opportunity to control the testamentary act; (2) that the decedent's condition was such as to permit of a subversion of his freedom of will; (3) that there was activity on the part of the person charged with exercising undue influence; and (4) that such person unduly profited as beneficiary under the will (*Estate of Graves,* 202 Cal. 258, 262 [259 P. 935]; *Estate of Hampton,* 39 Cal.App. 2d 488, 498 [103 P.2d 611]). �en It is also the law that evidence must be produced that pressure was brought to bear directly upon the testamentary act (*Estate of Arnold,* 16 Cal.2d 573, 577 [107 P.2d 25]).

▄ Respondents emphasize the fact that prior to 1942 appellant took very little, if any, interest in his brother William or the latter's affairs, and was not associated in either a business or social way with the Llewellyn family group which included respondents, at the family home on Berkeley Square. That it was not until the death of the sister, Mrs. Milner, that appellant took much, if any, interest in his brother the decedent. That he then became a frequent visitor to his brother and commenced a systematic campaign to unduly influence the latter against respondents and to obtain the property and estate of decedent. We perceive nothing sinister in the active interest appellant took in his brother after 1942. Here was a family, closely associated in the development and maintenance of a large industrial concern. Appellant married and thereafter did not reside with the other members of the family. When death removed all the members thereof save and except decedent and his brother, appellant herein, it seems only natural to us that as sole survivors of a once large family the relations between these two brothers should become closer. The right of courts and juries to draw inferences is not arbitrary and unrestrained. An inference must not only be founded on a fact legally proven, but on such a deduction from that fact as is warranted by a consideration, among other things, of the propensities of people and the course of nature (Code Civ. Proc., § 1960). The foregoing proven facts do not warrant a natural inference of perfidy but on the contrary, under the circumstances here present, reflect the natural propensities of one brother toward another. Furthermore, in the absence of

evidence, it cannot be assumed that a person is guilty of wrongdoing. On the other hand, it must be presumed in the absence of evidence to the contrary, that one is innocent of crime or wrongdoing (Code Civ. Proc., § 1963, subd. 1).

Considering the foregoing factors, none of which standing alone has the effect of creating a presumption against the validity of the testamentary document, but the probative force of which in combination will make the question as to undue influence one for determination by the triers . of fact, we find as to the first consideration, that it is well settled that mere opportunity, even if coupled with a motive to influence a testamentary act, is not sufficient to invalidate such an act (*Estate of Kilborn,* 162 Cal. 4, 11 [120 P. 762]). And the evidence must indicate more than general influence.

The influence necessary to invalidate a testamentary document must be a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made (*Estate of Carithers,* 156 Cal. 422, 428 [105 P. 127] ; *Estate of Gleason,* 164 Cal. 756, 765 [130 P. 872] ). From the evidence hereinbefore set forth we find no such showing. The testimony herein amounted to no more than a showing that appellant was so situated as to have an opportunity to unduly influence the mind of the testator and at the most, that the actions of appellant might be described as suspicious. Obviously, under the rulings of appellate tribunals in prior cases, such evidence is entirely insufficient to support the finding of the jury. The declarations of the testator that he intended to ''take care'' of respondents were admissible only to show the relations between them, and the state of the testator's mind with reference to his nephew and niece.

As to the second of the aforesaid considerations, we deem the evidence wholly insufficient to establish the fact that on the day he executed the challenged will, or prior thereto, the condition of the testator was such as to permit of a subversion of his freedom of will. In our consideration of the issue of undue influence, we have herein recited the testimony which conclusively shows that instead of being passive in the face of suggestions concerning his affairs the testator vigorously resisted any interference, and time and again he declared and avowed his intention to dispose of his property as he himself saw fit. What was said by this court in the *Estate of Hull,* 63 Cal.App.2d 135, 143 [146 P.2d 242], is here pertinent:

"The burden was on the contestants to show undue influence, and in meeting that obligation it is not sufficient for them merely to show circumstances consistent with the exercise of undue influence, but before a duly and solemnly executed will can be invalidated, circumstances must be shown that are inconsistent with freedom of action on the part of testatrix. (*Estate of Burns, supra.*)"

On the very afternoon the will of March 12, 1945, was executed, the testator was sitting in a chair looking out the window and smoking a cigarette. And the hospital chart introduced as one of the respondents' exhibits shows the following entry at 4 o'clock on that afternoon: "Mentally very clear," and at 4:30 p. m., "Mr. Mueller (attorney who prepared the will) and Mr. Brown (one of the witnesses to the will) with patient." Though drugs were administered to the testator intermittently to produce sleep and rest, the record is without contradiction that no drugs of any kind were administered during the entire afternoon of March 12, 1945, the date the will was executed.

Coming now to the third factor, viz., activity on the part of the person charged with exercising undue influence, the evidence is clear and uncontradicted that appellant was not in the room when the contents of the will were discussed, nor when the testamentary document was executed. Appellant did contact the attorney who prepared the will, but that was at the request of the testator. The attorney was not counsel for appellant but was well known to the testator, and some years before had prepared a will for him. It was at the request of the attorney that appellant procured the attendance of the witness Brown who was at the hospital åt the time visiting his sick wife. Mr. Brown had long been a friend of the testator. Securing of an attorney to draw a will for another has been held not to constitute participation (*Estate of Hull,* 63 Cal.App.2d 135, 139, 142 [146 P.2d 242]). In the instant case the evidence conclusively shows that the will was prepared from directions given by the testator to his attorney and there is very strong evidence that it was the testator's voluntary act (*Estate of Fraser,* 75 Cal. App.2d 99, 104 [170 P.2d 704]). The evidence in the case at bar of activity on the part of appellant is far more lacking in substantiality than that present in *Estate of Hamburger,* 126 Cal.App. 455, 463, 464 [14 P.2d 802], wherein it was held that a motion for nonsuit was properly granted. In

the case now engaging our attention, nothing more was shown than the presence of an opportunity for appellant to influence the testator's mind with a possible interest or motive so to do. This is totally insufficient. Before a testamentary document will be overthrown because of the exercise of undue influence, the proven circumstances must be inconsistent with voluntary action on the part of the testator.

The final circumstance hereinbefore referred to is that the person charged with exercising undue influence unduly profited as beneficiary under the will, or in other words, that the will as executed was an unnatural one. Because of the provisions of section 20 of the Probate Code, no person who is competent to execute a will is called upon "to consult or satisfy the wishes or views of juries or courts" (*Estate of Nolan,* 25 Cal.App.2d 738, 740 [78 P.2d 456]). However, the claimed "unnatural" provisions of a will may be considered as an element supporting an inference of undue influence when the testament is attacked on that ground and the claim is made that by reason of undue influence the testator was induced to make an unreasonable or unjust discrimination against some of his heirs at law. We shall therefore, now dispose of the claimed unnaturalness of the will of March 12, 1945. The provisions of section 20 of the Probate Code entitle every person "of sound mind" to dispose of his property by will as he sees fit—not in equal proportions to his relatives or to those who would inherit under the laws of succession in case of intestacy. To us it does not necessarily appear from the evidence that the will herein was either unnatural or unjust. Nephews and nieces are not necessarily the natural objects of the bounty of an uncle.

The reason given by the testator to the draftsman of the will appears to us to be neither illogical or unnatural. It is as follows: "the young people (referring to respondents) have received over a million dollars from the Llewellyn's and I think that is enough for young people, don't you think so?" No evidence was offered by respondents to disprove this assertion. It was also stipulated at the trial that respondents were the beneficiaries of decedent's life insurance policies totalling the not-insignificant sum of $22,865.54. Since the aggregate of decedent's estate was not more than $150,000 we can not perceive how it can reasonably be said that his failure to make provision for respondents in his will was unnatural. It is true, as urged by respondents, that the will here under attack, was at variance with the provisions

of previous testamentary documents, in one of which appellant was not remembered, and in the other of which the bulk of decedent's estate was bequeathed to the respondents. Where, however, there are facts explanatory of such conflict, and if the circumstances disclose an adequate reason for a departure from the provisions of an earlier will, the fact of conflicting intention must be deemed to be without probative force or effect (26 Cal.Jur. 659). Explanatory matters are to be found ordinarily in the events transpiring in the life of the decedent, changes in his affections, and even the peculiarities of his temperament.

Following the death in 1942 of decedent's only sister, the mother of respondents, his relations with his brother, appellant herein, became closer, and the testimony shows that commencing in 1943 they would see each other often. As to decedent's feelings toward his nephew and contestant Reese L. Milner, the record indicates that he elected to leave the Berkeley Square home where he resided with Reese Milner, and spend intervals at the Jonathan Club during the year 1944. According to the record he was at the club that year from March 17 to 31, from July 6 to 19, and from September 26 to November 11. During much of this time respondent Mrs. Cheesewright was absent from Los Angeles, although she corresponded with her uncle, the decedent, once a week. There also remains the testimony that decedent executed a will on March 9, 1945, the terms of which were in entire accord with the challenged will of March 12, 1945. When the attorney who drew the wills of March 9 and March 12, 1945, returned on the latter date he was told by the decedent that he wanted appellant to have everything. Confirmation of this is found in the testimony of the witness to the will, Arthur G. Brown, conceded by respondents to be a disinterested and truthful witness, who testified that decedent stated, "that is right; I want Dave (appellant) to have everything, my guns and everything." It would, therefore, appear that the will of March 12, 1945, was a complete confirmation of the wishes of the testator as expressed three days previously (*Estate of Stump,* 202 Cal. 308, 310 [260 P. 543]). Bearing on the question of the claimed unnaturalness of the will, it must be remembered that a will cannot be characterized as unnatural, even though those not remembered therein are natural objects of the testator's bounty, when the evidence shows that such persons were in no need of funds, aid or assistance (26 Cal.Jur. 699).

In the case at bar the facts are such as to put it beyond the reach of the rule that under certain circumstances importance should attach to the consideration that a will was unnatural.

From a review of the entire record, we are forced to the conclusion that there is not sufficient evidence to support the verdicts and the judgment predicated thereon. As was said in the case of *In re Wilson*, 117 Cal. 262, 279 [49 P. 172, 711]:

"... the case presents another instance of a jury being, insensibly perhaps, carried away from the real issues before them by the notion that the will was not such as in their opinion it ought to have been, and, therefore, should be set aside."

Persuaded as we are, from a consideration of the entire record, that the same fails to disclose any *substantial* evidence that at the time of the execution of the will of March 12, 1945, the testator was mentally incompetent to execute the same, or that said testamentary document was procured by or through undue influence exercised upon the testator by appellant, and that, therefore, a verdict should have been directed in favor of proponent and appellant, and that a motion therefor was made before the entry of judgment, the judgment rendered herein is reversed and the cause remanded with directions to the court below to enter judgment admitting to probate the will executed by decedent, William Llewellyn, dated March 12, 1945.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied March 8, 1948.

Respondents' petition for a hearing by the Supreme Court was denied April 6, 1948. Carter, J., voted for a hearing and filed the following opinion:

CARTER, J.—I dissent from the order denying respondents' petition for hearing in the Supreme Court in the above-entitled cause primarily because, in my opinion, it was an abuse of discretion for the appellate court to direct the entry of a judgment in favor of appellant. While it is true that section 629 of the Code of Civil Procedure provides that if a motion for a directed verdict or for a judgment notwithstanding the verdict is denied, the appellate court on appeal from the judgment may order judgment to be entered in favor of the appellant when it appears from the whole record

that a verdict should have been so directed at the trial, I do not believe that the court was warranted in making such direction in this case even if the views expressed by the court as to the insufficiency of the evidence is correct. It is my view that in cases such as this where it may be possible for respondent to offer additional evidence on the retrial of the case, he should have that opportunity, and that the power of the appellate court to direct a judgment notwithstanding the verdict should be exercised only in those cases where it clearly appears that it would be impossible for a party against whom the judgment is directed to produce sufficient evidence to support a judgment in his favor upon a retrial of the case. Those familiar with trial practice know that it quite often happens that a stronger case can be made on a retrial than during the original trial. Furthermore, until the appellate court held that the evidence was insufficient to support the judgment, the prevailing party in the trial court had reason to believe that he had presented all of the proof necessary to support the judgment inasmuch as the trial court had ruled in his favor in denying motions for a nonsuit, directed verdict and judgment notwithstanding the verdict. In my opinion it is out of harmony with the modern concept of justice and fairness that a prevailing party in the trial court should be precluded by an arbitrary ruling of an appellate court from the opportunity of presenting evidence which may be readily available on a retrial to support a judgment in his favor.

From the cursory examination which I have been able to make of the record in this case, it is my present view that under settled rules governing an appellate court in passing upon the weight and sufficiency of the evidence and the credibility of witnesses, there is ample evidence in the record in this case to support the judgment of the trial court on the grounds of both mental incompetency and undue influence and that the judgment should therefore be affirmed, but I have not had an opportunity during the limited time allowed for the review of a petition for hearing to make an exhaustive study of the record and I am therefore not in a position at this time to express a considered opinion as to what final determination should be made in this case.