[Civ. No. 16547.   Second Dist., Div. Three.   Dec. 31, 1948.]

Estate of LAURA G. BROWN, Deceased. ESTHER B. BROWN as Executrix, etc., Respondent, v. ARTIE GEORGE COLLINS et al., Appellants.

H. L. Richardson for Appellants.

Newby, Holder & Newby for Respondent.

SHINN, P. J.—Two wills of Laura G. Brown were offered for probate, one a holographic will dated November 19, 1942, which named Esther B. Brown sole beneficiary and appointed her executrix, the other dated December 24, 1946, by which the entire estate of testatrix was left to Artie George Collins and Mary B. Collins, who were appointed executors. The latter will was witnessed and executed upon a form partly printed and partly typewritten. Esther B. Brown filed opposition to the probate of this will and the respective petitions and opposition were heard together. The later will was denied probate and the earlier one admitted by a single order. Artie George Collins, proponent of the later will, and Mary B. Collins, appeal from "the order in the above entitled matter sustaining the opposition of Esther B. Brown to probate of will dated December 24, 1946, which order was entered on the 28th day of November, 1947, and the records of the above entitled court."

The court made extensive findings, the material provisions of which are the following: Laura G. Brown was about 72 years of age; by reason of her age and physical condition her mental faculties were so impaired that she was easily influenced by those in whom she had confidence; Artie George Collins and Mary B. Collins moved into her home as strangers; Collins represented himself to be a minister of the gospel, which decedent believed; decedent had the utmost confidence in Collins and his wife; the latter, taking advantage thereof, were able to and did control the actions of decedent and dictate the terms of her will. Conclusions and judgment followed, denying admission of the will to probate.

The question on appeal is whether the evidence supports the findings above mentioned. ■ An examination of the evidence should be directed to the following inquiries: (1) Did a relationship exist between the testatrix and the beneficiaries which would give the latter opportunity to control the testamentary act; (2) was the condition of decedent such as to permit of a subversion of her freedom of will; (3) were the provisions of the will distinctly at variance with the previously expressed intentions of the testatrix; (4) were the beneficiaries active in procuring the execution of the will; and (5) did the beneficiaries profit unduly by the will. (*Estate*

*of Graves,* 202 Cal. 258, 262 [259 P. 935] ; 26 Cal.Jur. pp. 647, 648.) ■■ If a confidential relationship existed and the beneficiaries were active in procuring the execution of the will, the burden was cast upon them to show that the will was not induced by undue influence. (*Estate of Witt,* 198 Cal. 407 [245 P. 197] ; *Estate of Johnson,* 31 Cal.App.2d 251 [87 P.2d 900] ; *Estate of Harkleroad,* 62 Cal.App.2d 60 [144 P.2d 88].)

■■ We have concluded that the findings are well supported by the evidence. Decedent had been educated as a music teacher and had followed that profession; she was described by the witness as weighing somewhere between 300 and 400 pounds; she had suffered an accident as a result of which she had been deprived for some years of the use of her left arm which hung limp by her side; she was ill, confined most of the time to her bed, and was unable without assistance to get into or out of bed. She lived alone in a small house which she owned and she had no living relatives. She was an extremely religious woman and practiced the teachings of the Bible, in which she had complete trust. She had never married. Artie Collins was an employee of the Bureau of Power & Light of the city of Los Angeles. Mary B. Collins was his wife, and until the morning of December 16, 1946, neither was acquainted with Laura G. Brown, or even knew her name. On the night of December 15th, Miss Brown was very ill; she sat in a chair, unable to get into bed. A friend, Grace Rafferty, was with her. Mrs. Rafferty stored her furniture in Laura's house and was attentive and devoted to her. Mrs. Rafferty spent the night with Laura, and sometime after midnight got her back into bed. On the morning of the 16th Artie Collins appeared at the door with a Bible in his hand. He represented that he was Laura's pastor and that he had come to call upon her. Collins was admitted to the house, walked up to Laura's bed and Laura, who was in a highly excited condition, called to Mrs. Rafferty to have him leave the house. Later in the morning Laura's friends, Howard R. Brown and Esther B. Brown, came to her home and found Collins emerging from her bedroom with a Bible in his hand. They were asked by Laura to have Collins removed from the house. When they questioned Collins, he told them that he was Reverend Artie Collins, that he had a church of 150 people out in Los Angeles, that they had a fund that they used to take care of people with, that he was a pastor of Miss Brown's church and wished to take care of her, but she

would not permit him to do so. He was not and never had been a minister, nor had he ever conducted a religious service. Shortly after that, Artie Collins and his wife moved into Laura's home and took complete charge of the situation. Collins testified they did this at Laura's request; that upon the occasion of his first meeting Laura on December 16, she told him she had no one to take care of her, and she said, "if you all stay with me I see that you get all my property and things—you stay here you can have my property." Within four days after first meeting Laura, Collins and his wife obtained from her a deed to her home. Within eight days they had obtained the will naming them as sole beneficiaries. In the meantime, one or the other was in constant attendance upon her with every opportunity to exercise influence upon her. They called her "Aunt Laura," and Collins represented to Esther Brown that he was Laura's nephew. On December 18th, two days before the deed was executed Laura stated to Esther that Collins and his wife had come to her as strangers; that Collins was a minister in a church; that he left about 3 o'clock each day to attend to church activities; and that she had decided that he and his wife had been sent to her as an act of God. Collins had complete charge of the household and kept up his pose as Laura's spiritual adviser. Other circumstances might be added to the foregoing, but the facts we have related were quite sufficient to support a finding that a confidential relationship existed between the deceased and Collins and his wife. (*Estate of Miller*, 16 Cal.App.2d 154, 166 [60 P.2d 498].)

There was also sufficient evidence to prove activity on the part of both Collins and his wife in procuring the deed and the will. While it was not shown that Collins had arranged the preparation of the documents, there was testimony that he produced the will, had Miss Brown sign it, and took it back from her after it was signed. He also arranged for the presence of a Mr. Woods as a subscribing witness to the will. Woods was a coemployee in the city water department and a stranger to Laura. Collins and his wife were present when the will was signed and Mrs. Collins handed the pen to Laura, saying, "here is the pen to sign the will with." Woods testified that when he arrived at the house Laura was lying on the floor; she had fallen and was unable to arise; she was lifted from the floor, placed in a chair, and shortly afterward she subscribed her name to the will. This document, we might

add, bears an almost undecipherable signature. Mr. Woods' signature also appeared on the deed as a witness to Laura's signature. He testified that he subscribed the deed as a witness in the office of attorney Richardson, and that this had been arranged by Collins. The deed shows a garbled certification by Mr. Richardson, as a notary public, which purported to certify that the deed was acknowledged by Woods as a subscribing witness. Collins and his wife were present at the time the deed was signed. Another circumstance which indicates that Collins caused the deed and will to be prepared is that in both instruments he is named as Artie George Collins and his wife as Mary B. Collins. There was testimony from which it could have been inferred that Laura did not know the full names of either Collins or his wife. She was at all times unable to leave the house and there was no evidence that she ever communicated with anyone with respect to the preparation of the deed or the will. Other circumstances tending to show the activity of Collins in controlling Laura's affairs will be found in the facts hereafter stated.

The later will evidenced a complete change in the testamentary plan expressed in the earlier will. Esther B. Brown had been an intimate friend of Laura's for 22 years. Laura had been a friend of Esther's mother. Esther was a regular visitor in Laura's home and her most intimate friend. From the summer of 1946, until about the 20th of November of that year, she had seen her at least once a week, and during the latter part of the period as often as every three days. She had attended Laura in her illness and exhibited great devotion to her. She had helped her financially and, according to the statements of Laura to others, had been the means of preventing the loss of Laura's home. Not only by the will of 1942, but by her repeated statements to others, Laura had expressed the intention that Esther should receive her property upon Laura's death. There was ample evidence that before Collins and his wife moved in, Laura had no intention of leaving her property to anyone but Esther. On the 18th of December, upon the occasion of Esther's last conversation with her, Laura said to Esther, ''everyone should have a piece of land to die on. It saves one's self respect . . .''; that she would never deed the property over to anyone; the land was left to her (Esther) to pay her funeral bills; she had left her property to Esther because she knew she could be trusted; her mirror was to be given to Mrs. Deovlitian, and

one of the chairs to Mrs. Edwin Height; she owed the vegetable man $7.00 which Esther was to pay, as well as any other bills she might owe. She stated to Esther that she wished Collins and his wife to be her caretakers and that they would wait until they could be paid out of the estate. She had Collins and his wife called into the room and stated to them that Esther was her dearest friend, was taking care of the property and if they would stay with her and take care of her Esther would pay them when the estate was settled. Collins and his wife then agreed to remain with Laura with the understanding that they would be paid from her estate when the property was sold. Laura had stated to another intimate friend, Christine Ullrich, at least a dozen times, that Esther had been good to her and paid her taxes, prevented her losing the property, had given her money and that she intended that Esther should receive all of her property, everything she had, upon her death.

Testatrix was prevented by Collins and his wife from receiving independent advice from her friends. As late as the 6th of January, when Mr. and Mrs. Rafferty were visiting Laura the latter asked Mrs. Collins to leave the room and stated to the Raffertys, ''she wants me to sign everything over'' and when asked if she had done so replied, ''I have not.'' After that Mrs. Rafferty attempted every few days to see Laura and on each occasion Collins and his wife refused to allow her to enter Laura's room. After December 18, Esther Brown also made frequent efforts to see and talk with Laura and was prevented from doing so by Collins and his wife. Collins continued to exercise his assumed authority over Laura's affairs. On December 18th, Laura had asked Esther to take a box which contained some of her possessions, including a small amount of money, and to care for it. Esther took the box to her car, where Collins followed her and demanded that she surrender the box to him, which she did. On a subsequent occasion when she entered the home and endeavored to talk with Laura, Mrs. Collins stood in front of the door and prevented her entering the bedroom.

A Dr. Daniel Beltz, a physician, attended Laura on one occasion in November, 1946, and gave her what he referred to as a neurological examination. He testified that she was mentally confused and that he diagnosed her condition as one which was the result of a cerebral accident of some kind, either a thrombosis or a hemorrhage. She was also suffering

from high blood pressure. He expressed the opinion that she was not at that time mentally competent.

Laura remained in an utterly helpless condition until her death in the following February. From the time Collins and his wife arrived she was wholly dependent upon them by reason of their exclusion of the friends upon whom she had formerly depended.

It is true that Collins and his wife gave Laura a certain measure of attention, but there was evidence that for some weeks before her death she was sadly neglected. The condition in which she was allowed to remain was so distressing we refrain from describing it. Nevertheless, Collins succeeded in maintaining the complete confidence of testatrix and the question whether he and his wife made improper use of the influence which they obtained over her is to be best judged by the results which they accomplished.

The court must have been impressed by the contrast between Collins, who adopted the role of a samaritan and dispenser of charity, in order to accomplish a wicked purpose, and the pitifully helpless old woman who was the more easily victimized because of her great faith and her devotion to the teachings of the Bible, which she had accepted as her constant guide through life.

A more extended recital of the evidence would only confirm the essential features which we have mentioned. There was a complete failure on the part of proponents to meet the burden which rested upon them of satisfying the court of the absence of the use of undue influence. There was strong evidence that Laura regarded Collins as her spiritual adviser. She realized that she had but a short time to live and no doubt was consoled by the presence of the impostor who prayed by her bedside and sang hymns at her piano. She said to Esther Brown, ''There is not room for me in my Father's house at present. I am going to have to live a little longer.'' Collins and his wife gave her no opportunity to escape from their influence. We have searched the record in vain for evidence tending to dispel the presumption that arose from proof of the relationship and activities of the sole beneficiaries of the will.

All the concurring factors which we have discussed were more than sufficient to make out a case of undue influence. In fact, we do not see how the court could reasonably have concluded that the will was that of Laura G. Brown and not

one which she made under the compelling influence of Collins and his wife.

Although the appeal was not taken from that part of the order which admitted to probate the will of November 19, 1942, we have treated it as an appeal from the entire order.

The order is affirmed.

Wood, J., and Vallée, J., concurred.