[Civ. No. 14351. First Dist., Div. One. Sept. 1, 1950.]

Estate of SARAH WILLIAMS, Deceased. MARGUERITE BLAND, Appellant, v. JOHN POTTER, Respondent.

K. R. McDougall for Appellant.

Crist & Stafford and John M. Donegan for Respondent.

PETERS, P. J.—Sarah Williams died June 24, 1948. Her sole surviving relative was John Potter, a nephew. She left an estate consisting of several hundred dollars in cash and a house and lot in Palo Alto valued at about $6,000. On May 11, 1948, she executed a will naming Marguerite Bland executrix, and leaving her entire estate to Rena Suddeth, thus disinheriting Potter, who had been sole legatee under a prior will. Potter contested the probate of the will on the grounds that the testatrix was of unsound mind, acted under the undue influence of Rena Suddeth, and that the will was drawn as a result of the fraud of Rena. The cause was tried before a jury to whom three special verdicts were submitted. By a 9 to 3 vote the jury found that Sarah was of sound mind when the will was executed; by a 10 to 2 vote that Sarah was acting under the undue influence of Rena in executing the will; and by a unanimous vote that the execution of the will was not procured by fraud. Based on the verdict of undue influence, the trial court denied probate of the will. From that judgment Marguerite Bland, proponent of the will, appeals. Rena Suddeth is, of course, the real party in interest, she being the sole legatee under the will.

The sole argument of appellant is that the finding of undue influence, as a matter of law, is totally unsupported by the evidence. With this contention we agree.

Sarah was a laundress, household domestic, and cannery worker. She came to live in Palo Alto in 1932, and purchased the home there that constitutes the main asset of her estate. She made monthly payments on this house for many years. Her health started to fail about 1941, and grew progressively worse until her death on June 24, 1948. During this period

she suffered from diabetes, arteriosclerosis and uremia. She became completely blind in 1944. After 1944 she was almost entirely dependent on friends to administer the required insulin and to care for her in other ways, although, on several occasions, either Sarah or Potter hired practical nurses. Her condition became so bad, and her care so arduous, that she was admitted to the Santa Clara County Hospital on February 13, 1948, where she remained, completely bedridden, until her death. She was in her sixties when she died.

John Potter, respondent, went to live with Sarah, his aunt, when he was 3 years old, at which time his father, Sarah's brother, died, leaving his wife with two children, John and Lillian. The daughter was brought up by her mother, but John came to live with his aunt Sarah, who was then residing in San Antonio, Texas. John lived with, and was brought up by, Sarah until he was 18 years of age, when he left her home to earn his own living. After leaving Sarah's home, John kept in touch with his aunt and frequently gave her financial assistance when she was out of work or ill. On some occasions John made the payments on the house and advanced money to pay the taxes. On a few occasions Sarah sent John money when he was in financial distress. John frequently visited his aunt, and she frequently telephoned to him. There can be no doubt at all that the relationship between these two was very close and friendly, at least up to 1944. In fact, in 1944, Sarah conveyed the house and lot to John, but a few months later requested him to reconvey the property to her so that she could sell it and acquire money for care in a private sanitarium. John, without protest, reconveyed the property to Sarah. She immediately had her lawyer draw a will, which she signed, leaving the property to John and to his sister. After the sister's death, John was the sole legatee under this 1944 will. This will was revoked by the 1948 will, if the latter will was valid.

Sarah frequently told many different people that she wanted all of her property, upon her death, to go to her nephew and niece, and, after the niece's death, she frequently stated that she wanted the property to go to John. Several witnesses testified that such declarations were made during 1947, and up to several days before Sarah went to the hospital. One witness testified that such a declaration was made to him about a month before Sarah died, which would make such declaration subsequent to the execution of the disputed will.

As opposed to this evidence, there is testimony to indicate that sometime in 1944, Sarah, rightfully or wrongfully, became displeased with her nephew. She apparently felt that John should pay for her care in a private sanitarium, and apparently deeded the property to him upon his promise to send her to a private sanitarium. She had a great fear that she would die penniless and be buried in a pauper's grave, and that her debts would not be paid. She did not want to go to a county hospital. Marguerite Bland, a secretary and notary public and friend of Sarah's since 1935, and who had handled many business transactions for Sarah, testified that Sarah told her that she demanded the deed back from John because she discovered that John did not intend to put her into a private sanitarium but was going to let her go to the county hospital. She testified that after that episode Sarah was very displeased with John and never again mentioned his name to her. Rena Suddeth, the sole legatee under the 1948 will, testified that in May, 1948, Sarah told her that she was displeased with John because "He just put me in the [county] hospital . .. . and he wouldn't even come to see me, and he wouldn't answer my letters. . . . I don't want John . . . to have nothing I got." Admittedly, the last time John saw Sarah was in November, 1947, although in prior years he had visited her several times a month. On the very day the disputed will was executed, May 11, 1948, Sarah told the subscribing witnesses that she did not believe John would take care of her body after her death, and would not "put her away decently," but that Rena would do so, and therefore she wanted all her property to go to Rena.

Rena Suddeth was a friend of Sarah. She first met Sarah in 1941 or 1942 when she became a roomer in Sarah's house. She was a member of the church attended by Sarah, and, pursuant to the custom in that church, called Sarah "mother," and Sarah called her "daughter." Since 1943, Rena has resided in Salinas, but thereafter frequently visited Sarah, usually upon Sarah's request. After Sarah became blind Rena frequently did errands for her, and visited her when she was lonesome. Undoubtedly, the two became very good friends. Rena testified, and there is no contrary evidence, that she never asked Sarah to deed or will any of her property to her. She admitted receiving, in January of 1948, as a present, deeds to two Oklahoma lots, but testified that she did not request this conveyance. Admittedly, these lots were of little value. She testified that the only time Sarah had

ever discussed leaving her property to her was when Sarah was in the hospital in San Francisco (date not specified), at which time Sarah told her that her nephew "wasn't treating her right"; and then "she asked me if I would, if she would deed me, if she'd will me her property, if anything happened to her, would I see that she'd be put away and pay her bills, and I told her that I would." Under date of November 3, 1947, Rena wrote a letter to Sarah. The letter contains these sentences: "Now, if you do as you was speaking about doing, I will promise you you won't be sorry. I will treat you just like you was my real mother. I will pay your bills and clear up everything so you won't have nothing to worry about, and I will put it down in black and white, or if you have the papers made out, I will sign them. Mother, you let Jesus lead you, and whatever you want to do, it is okay with me. Your will is my pleasure."

There was considerable evidence from close friends of the deceased to the effect that before and after Sarah entered the Santa Clara hospital her conversation was so confused, incoherent and unintelligent, and her conduct so irrational, that these friends believed her of unsound mind. There was testimony from other friends and from a doctor and a nurse at the hospital to the effect that although, after Sarah entered the hospital, she was, on occasions, irrational, she also had periods when she was rational and of sound mind. This evidence would have supported a finding either way on the issue of mental competency, but that issue has been settled by the finding of the jury that on May 11, 1948, she was of sound mind. Since Potter has not appealed, that issue is no longer in the case. It must be assumed, on this appeal, that on May 11, 1948, Sarah was of sound mind. Such evidence is now pertinent only insofar as it may have any relevant bearing on the issue of undue influence.

The circumstances under which the will was drawn were described by Rena and the attorney draftsman. Rena testified that, after Sarah went to the county hospital, she visited her about four times. One of these visits occurred early in May, 1948, at which time Sarah asked her to get her a lawyer. Rena's testimony about this visit is as follows: ". . . when I walked in, I spoke to her, I says, 'Oh, Mother, how are you?' She said, 'Rena, is that you?' I said, 'Yes.' She said, 'Oh, I'm glad, I'm so glad you come, Baby.' I said, 'What for, what's the trouble?' She said, 'I want you to get me a lawyer.' I

say, 'A lawyer?' I said, 'What for?' She says, 'Mr. Moore and John isn't treating me right,' she said, 'He just put me in the hospital,' she said, 'I wrote John and he wouldn't even come to see me, and he wouldn't answer my letters, and I see Mr. Moore every now and then.' She says, 'If I was to die, Baby, I wouldn't have money enough to be buried.' I says, 'Oh, yes,' and she say, 'Mr. Moore was here, I asked him to give me some money, a little money to buy me something extra, if I wanted it, and Mr. Moore told me I did not have no money, and I asked him what happened to my pension. He said they had cut my pensions off,' and I says, 'Oh, I don't think they have.' She asked me if I would go see if they had cut her pensions off, and I told her—she said, 'Baby, if I will my property to you, if I get well, can I come and live with you?' And I said, 'Mother, if you don't will me nothing, you can come and live with me.' She said, 'Yes, I want you to have it, because I don't want John and Mr. Moore to have nothing I got.' ''

The Mr. Moore referred to in this testimony was Sarah's guardian, she having been declared incompetent in March, 1948, apparently because of her physical condition. It should also be noted that prior to May of 1948, Mr. Crist of Palo Alto had been Sarah's attorney for a period of about 20 years. This fact was apparently unknown to Rena. Why Sarah did not have Rena call Mr. Crist does not appear.

Rena testified that she did not know any attorneys in Santa Clara County, but that she did know that Marguerite Bland was a good friend of Sarah's and was in business in Palo Alto. The day after the above quoted conversation Rena went to Mrs. Bland and asked her to recommend an attorney for Sarah. Mrs. Bland recommended K. R. McDougall. Rena went to McDougall's office and there met McDougall and Robert Ensign, an attorney in the office, and told them that Sarah wanted an attorney to draw a will. There is no evidence that she told these attorneys that Sarah wanted to leave the property to her.

Ensign promised to call at the hospital, which he did. In all, he made three visits. He first called on Sarah on May 4, 1948, and introduced himself, whereupon Sarah told him she wanted to make a will and leave all of her property to Rena. On this occasion Ensign spent about 20 minutes with Sarah talking over the proposed will.

The second visit also lasted about 20 minutes and occurred on May 10th. On that visit Sarah confirmed her desire to leave

all of her property to Rena, and referred to her nephew in such a manner as to indicate that she was displeased with him.

The third visit occurred on May 11th when the will was executed. Ensign knew that Sarah had been declared incompetent, and had examined the guardianship court records. On this visit of May 11th Ensign took with him a court reporter who took down in shorthand everything that occurred during this visit. The transcript of this meeting is in the record. The persons then present were Ensign, Sarah, the court reporter and a nurse. The transcript discloses that Sarah had some difficulty in sustaining her thoughts until the completion of her sentences, and that during the conversation she gave three different addresses for her home—381, 318 and 385 Chestnut Street. A reading of this transcript demonstrates that, while Sarah had some difficulty in talking, she was clearly aware of her property holdings and was most positive that she wanted her property to go to Rena. She stated, several times, that it was her own idea that the property should go to Rena. When Ensign reminded her that Potter was her nephew and asked her if she wanted to leave any of her property to him, she replied: ''No, not a nickel, because he's tried to—he wants to see me down in the poor house.'' She also stated that she wanted her property to go to Rena because she felt that Rena ''would look after me and see that I would be put away decently; and my nephew, he wouldn't do that.''

The entire conversation lasted over an hour, and then Sarah signed the will by mark in the presence of Ensign, the court reporter and the nurse. Ensign and the reporter, at Sarah's request, witnessed the mark and then witnessed the will. It should be pointed out that Rena did not accompany Ensign to the hospital on the first two visits and that, although on May 11th she accompanied the lawyer to the hospital in his automobile, she waited in the car while Ensign went in to see Sarah, and did not enter the hospital until after the proceedings were completed.

On the above evidence the jury found that Sarah was mentally competent on May 11, 1948, that Rena was not guilty of fraud, but that the will was executed as the result of undue influence exerted by Rena. The sole question presented is whether the finding of undue influence finds any support in the record.

To sustain a finding of undue influence there must be some evidence, direct or circumstantial, that the person charged

with exerting such influence overcame the volition of the testatrix so that the will was not in fact her testamentary act. The rule has been frequently stated and applied. In *Estate of Trefren*, 86 Cal.App.2d 139, 146 [194 P.2d 574], the court quotes with approval the following statement of the rule from *Estate of Easton*, 140 Cal.App. 367, 370 [35 P.2d 614] : " 'The legal principles to be used in determining whether a will is the product of undue influence are well settled by a continuous line of decisions. They are set forth in the *Estate of Morcel*, 162 Cal. 188 [121 P. 733], *Estate of Bryson*, 191 Cal. 521 [217 P. 525], *Estate of Perkins*, 195 Cal. 699 [235 P. 45], and several later cases hereinafter cited. As pointed out therein, the kind of influence that may be held to be undue influence warranting a repudiation of a will "must be such as in effect destroyed the testator's free agency, and substituted for his own another person's will" (*Estate of Motz*, 136 Cal. 558, 563 [69 P. 294] ) ; and mere general influence, however strong or controlling, not brought to bear on the testamentary act, is not enough; it must be influence used directly to procure the will, and must amount "to coercion destroying free agency on the part of the testator" (*Estate of Keegan*, 139 Cal. 123, 127 [72 P. 828] ; *Estate of Fleming*, 199 Cal. 750 [251 P. 637] ; *Estate of Holloway*, 195 Cal. 711 [235 P. 1012] ). So, also, proof of mere opportunity to influence the mind of the testatrix, even though coupled with an interest or with a motive so to do, is insufficient. In order to warrant setting aside a will on this ground there must be substantial proof, direct or circumstantial, of a pressure which overpowers the volition of the testator and operates directly on the testamentary act.' "

The case of *Estate of Gleason*, 164 Cal. 756 [130 P. 872], has frequently been cited with approval on this point. There, at page 765, the court stated: "The unbroken rule in this state is that the courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of 'a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made.' "

█ It is apparent that in very few cases will there ever be direct evidence of undue influence, and that, in most cases reliance must be had upon circumstantial evidence. Many of the cases have referred to various "indicia of undue influence" in discussing the type of circumstantial evidence that may be entitled to consideration. (*Estate of Yale*, 214 Cal. 115, 122 [4 P.2d 153] ; *Estate of Brown*, 89 Cal.App.2d

496 [200 P.2d 888] ; *Estate of Graves,* 202 Cal. 258, 262 [259 P. 935] ; *Estate of Dopkins,* 34 Cal.2d 568, 574 [212 P.2d 886].)

Although not always stated in the same way, there are apparently five questions to which the courts have given consideration in discussing this problem :

1. Does the will cut off the natural objects of the decedent's bounty, and unduly benefit the proponent?

2. Is there a variance between the terms of the will and the expressed intentions of the testatrix?

3. Was there an opportunity afforded by the legatee's relationship to the decedent to influence the testatrix?

4. Was the decedent's mental and physical condition such as to permit a subversion of her freedom of will?

5. Was the beneficiary active in procuring the execution of the will?

If these so-called "indicia" of undue influence be considered in relation to the facts of the present case, singly or together, there is no substantial evidence to support a finding of undue influence.

### *Were the Provisions of the Will Unnatural?*

By her will Sarah cut off her nephew and left all of her property to one not a blood relative, but a close friend. Under the facts here, Potter, although only a nephew, may be considered the natural object of his aunt's bounty. But this fact alone is of very little legal significance. The evidence shows that rightly or wrongly Sarah had come to distrust her nephew, and had come to have great confidence in Rena. The rule that is applied in such cases is stated as follows in 26 California Jurisprudence, page 704, section 60 : "Where it appears that the disposition of the estate was inspired by reasons which were present in the mind of the decedent, no inference is to be derived from the fact that the provisions of the writing are apparently unjust to natural objects of the decedent's bounty. As to whether the decedent's reasons, in the estimation of the court, jury or third persons generally, may appear to be just or adequate, is not open to inquiry. Where the evidence shows that the relations between the decedent and the contestant were estranged, the apparent injustice to the contestant is deemed to be explained, regardless of proof in respect of the cause of estrangement. It is immaterial that the decedent may have been blamable, that he may have imputed wrong motives to the contestant, or that his dislike or antipathy had no substantial foundation. Indeed, no inference

is derivable from the fact that the decedent detested his relatives for some reason that is not apparent.'' (See, also, *Estate of Carson,* 74 Cal.App. 48, at p. 58 [239 P. 364].)

Potter argues that Rena profited unduly by the will, and that, therefore, the will was unnatural. In this connection three cases are cited in which a nonrelative beneficiary was held to have benefited unduly at the expense of a contestant who was a collateral relative, and where the appellate courts ruled in favor of the contestant. These three cases—*Estate of Bucher,* 48 Cal.App.2d 465 [120 P.2d 44]; *Estate of Lances,* 216 Cal. 397 [14 P.2d 768]; *Estate of Graves,* 202 Cal. 258 [259 P. 935]—instead of assisting respondent, in fact support appellant, because they emphasize the nature of the evidence that must exist before a finding of undue influence will be upheld. In the Bucher case the proponent was a doctor who had known the decedent less than two years. The decedent was in the hospital under the proponent's care. The doctor secured the will from decedent's apartment and secreted it. He refused to allow anyone except his attorney whom he had selected and who had drawn the will, to see the decedent, and no copy of the will was left with the decedent. All of the evidence indicated undue influence. The facts are entirely different from those in the instant case where there is no evidence sufficient to sustain even a reasonable suspicion, far less a reasonable inference, that undue influence was exerted. The same can be said of the Lances case. There, the proponent was an attorney and friend of the decedent. It was he who drew the will. It was prepared in his handwriting. His testimony that no undue influence was exerted was substantially impeached. In the Graves case the proponent advised the aged decedent to make a will in which he was named as sole legatee, and he introduced his attorney to the decedent and this attorney drew the will. Prior to the drafting of the will the decedent was very sick and in the hospital. The proponent had her removed from the hospital and taken to a room over the garage of his home where decedent was cared for by doctors and nurses selected by the proponent. After discussing the making of a will with decedent, the proponent had his attorney prepare it and supervise its execution. All of the circumstances supported the inference of undue influence.

*Was the Will at Variance with Sarah's Previously Expressed Intentions?*

Respondent answers this question in the affirmative, and supports his position by a reference to the evidence to

the effect that Sarah frequently had stated that she intended to leave her property to Potter, by the testimony of one witness that such a statement had been made after the challenged will had been executed, and by a reference to the provisions of the prior will. There was uncontradicted evidence of several witnesses that after 1944 Sarah had expressed displeasure with her nephew, and on the very day of the execution of the will, as shown by the transcript of proceedings then taken, Sarah explained why she did not want to leave her property to her nephew and why she wanted to leave it to appellant.

The rule to be applied under such circumstances, supported by the citation of many cases, is thus expressed in 26 California Jurisprudence, page 659, section 28: "However, changes of testamentary intention are frequently explicable; and if the circumstances disclose an adequate reason for a departure from the provisions of an earlier will, the fact of conflicting intention must be deemed to be without probative force or effect." (See *Estate of Llewellyn,* 83 Cal.App.2d 534, 567 [189 P.2d 822, 191 P.2d 419].)

*Did the Relations Between Sarah and Appellant Allow the Latter an Opportunity to Exert Undue Influence?*

■    Respondent points to the evidence that Rena and Sarah were close friends, and contends that this evidence compels an affirmative answer to this question. In this connection he cites *Estate of Graves,* 202 Cal. 258 [259 P. 935]; *Estate of Payne,* 94 Cal.App.2d 504 [210 P.2d 916]; *Estate of Anderson,* 29 Cal.App.2d 637 [85 P.2d 212]; *Estate of Nelson,* 134 Cal.App. 561 [25 P.2d 871], and *Estate of Gallo,* 61 Cal.App. 163 [214 P. 496], and argues, at length, that the rules announced in these cases compel an affirmance in the instant case.

The relationships existing between the proponents and the decedents in the cited cases were far more intimate, and gave far greater opportunity to exert undue influence, than did the relationship in the instant case. In each of them a true confidential relationship existed. The facts of the Graves case have already been set forth. There, the decedent was completely under the control of the proponent. The facts of the Payne case are very similar to those in the Graves case. There, the proponent took complete charge of decedent and her affairs. It was he who secured the lawyer who drafted the will. It was he who had the decedent removed to a house close to his, and it was he who arranged to have his doctor substituted

for the hospital doctor. In the Anderson case the decedent was staying with the proponent when the will was executed, and at that time decedent was ill and under the care of the proponent. The will was executed in the presence of the proponent and she was the one who propped decedent up in bed so that he could sign the will. In the Nelson case the proponent met decedent about two years before the challenged will was executed. On the very day she met decedent, she and her husband moved in with decedent. There was ample evidence that proponent and her husband exerted great efforts to have decedent execute a will in favor of proponent, and that the proponent acted in a completely unscrupulous fashion. In the Gallo case the proponent lived in decedent's home, was in business with her, and frequently acted as her agent. Proponent secured his attorney to draft the will, although decedent had her own attorney. An adopted daughter, who was very close to decedent, was practically disinherited.

In the present case the evidence shows but a close friendship between Sarah and Rena, not a confidential or fiduciary relationship such as existed in the above cases. (See, *Estate of Muller,* 14 Cal.App.2d 129, 132 [57 P.2d 994].) It must be held that there is no evidentiary support for a finding that the relationship between Sarah and Rena gave Rena the opportunity to exert undue influence upon Sarah.

*Was Sarah's Mental and Physical Condition Such as to Permit a Subversion of Her Will?*

There can be no doubt that Sarah was in a weakened physical and mental condition when the will was executed, but the finding that she was then of sound mind cannot be disregarded. While it is undoubtedly the law that the fact that the decedent was in a weakened condition when the will was executed must be considered on the issue of undue influence (*Estate of Teel,* 25 Cal.2d 520, 527 [154 P.2d 384]; *Estate of Payne,* 94 Cal.App.2d 504, 506 [210 P.2d 916]; see, 26 Cal. Jur. p. 645, § 17; 26 Cal.Jur. p. 669, § 34), such fact, standing alone, cannot support a finding of undue influence. As already pointed out, in such cases, it must be shown that influence was in fact exerted, and that such influence was a pressure which overpowered the volition of the testatrix. (See, particularly, *Estate of Trefren,* 86 Cal.App.2d 139, 146 [194 P.2d 574].)

*Did Rena's Activities in Procuring the Will Produce an Effect Upon the Will?*

This is the basic question involved. The connection of appellant with the drafting of the will has already been de-

scribed. According to the uncontradicted evidence it was Sarah who suggested making the will leaving her property to Rena. It was Sarah who asked for an attorney. While Rena secured the attorney, she did so only after consulting with Sarah's business adviser, and took the adviser's recommendation. She had no prior acquaintanceship with the attorney. She gave no instructions or suggestions to the attorney, other than to tell him that Sarah wanted to see him. She was not present when the will was executed. There is not one bit of direct or circumstantial evidence that indicates or tends to indicate that Rena exerted any influence on Sarah, or that Sarah's own will was subverted.

The proper rules to be applied to such a situation are stated as follows in 26 California Jurisprudence page 727, section 77: "The instrument is to be sustained as a general rule where the evidence shows that the decedent personally instructed the draftsman as to the preparation of the instrument, or that the instructions emanated from him; and the case of the proponent is strengthened by the circumstance that the decedent was alone with the draftsman. . . .

". . . Nor does any adverse inference arise from the circumstance that the draftsman was not the attorney whom the decedent customarily employed." And at page 730, section 78: "Nor does any significance necessarily attach to the circumstance that the proponent summoned the draftsman, accompanied the decedent to the draftsman's office, paid the fee, or acquired custody or possession of the instrument. But, within the rule that a prima facie case is established by proof of activity on the part of the proponent, accompanied by other indicia of imposition, the proponent is shown to have taken an active part where it appears that he employed the draftsman, assisted at the ceremony of signing, or conducted the decedent to the draftsman's office and was present when the writing was executed."

This analysis of the various indicia of undue influence indicates that no case has been cited where the court has upheld a finding of undue influence on the type of evidence here presented. On the other hand, there are many cases where the appellate courts have refused to find undue influence where the evidence in favor of the contestant was much stronger than that presented in the instant case. Two recent cases are representative of the prevailing view on this subject.

In *Estate of Llewellyn*, 83 Cal.App.2d 534 [189 P.2d 822, 191 P.2d 419] (hearing by Supreme Court denied), the jury

had found the decedent to be of unsound mind and acting under undue influence. The appellate court reversed with instructions to admit the will to probate. The proponent was a brother of the decedent; the contestants were nephews and nieces. The evidence of contestants showed that decedent was very ill and confined in a hospital when the will was executed; that decedent asked the proponent to get him a specified attorney so that a will could be drawn; that the proponent brought the attorney to the hospital but remained downstairs while the attorney visited decedent; that a will was then executed; that decedent asked the attorney to draft another will because he was not satisfied with his signature and might want to make changes; that the attorney drafted another will making proponent sole beneficiary, and when the attorney returned, proponent was present in the hospital and brought a subscribing witness into decedent's room. Two prior wills had been executed several years before, in one of which the proponent was omitted and in the other in which he was given but a share of the estate. There was ample evidence that while in the hospital the decedent's mind was confused and irrational, although the hospital records show that his mind was clear on the date the challenged will was executed. There was substantial evidence that decedent was childish, senile, and could not attend to his affairs. There was evidence that proponent kept pestering decedent to make a will; that on two occasions proponent had taken decedent to insurance companies and instructed the insurance representatives to change the beneficiaries from the contestant's to proponent's daughter; that proponent had tried previously to get decedent to sign a will prepared by proponent, but that decedent had refused; that proponent visited the decedent two or three times a day while decedent was confined in the hospital; that proponent tried to get decedent's keys to a locked box to investigate its contents; that when the will was executed the decedent was under the influence of phenobarbital; that while in the hospital decedent was very friendly to his nieces and nephews and referred to proponent as "grasping," "tight" and "stingy."

The court in discussing this evidence stated, at page 561: "The authorities in this state are numerous and harmonious to the effect that however unnatural a will may appear to be, or however much at variance with expressions by the testator as to his intentions with regard to relatives or the natural objects of his bounty, it may not be held invalid on

the ground of undue influence unless there be an actual showing of some sort of pressure which overpowered the mind and mastered the volition of the testator at the very moment of execution of the will. [Cases cited.]''

At page 563 appears this comment: ''The right of courts and juries to draw inferences is not arbitrary and unrestrained. An inference must not only be founded on a fact legally proven, but on such a deduction from that fact as is warranted by a consideration, among other things, of the propensities of people and the course of nature (Code Civ. Proc., § 1960). The foregoing proven facts do not warrant a natural inference of perfidy but on the contrary, under the circumstances here present, reflect the natural propensities of one brother toward another.'' The court then went on to discuss some of the so-called indicia of undue influence in the following language (p. 563): ''Furthermore, in the absence of evidence it cannot be assumed that a person is guilty of wrongdoing. On the other hand, it must be presumed in the absence of evidence to the contrary, that one is innocent of crime or wrongdoing (Code Civ. Proc., section 1963, subd. 1).

''Considering the foregoing factors, none of which standing alone has the effect of creating a presumption against the validity of the testamentary document, but the probative force of which in combination will make the question as to undue influence one for determination by the triers of fact, we find as to the first consideration, that it is well settled that mere opportunity, even if coupled with a motive to influence a testamentary act, is not sufficient to invalidate such an act (*Estate of Kilborn,* 162 Cal. 4, 11 [120 P. 762]). And the evidence must indicate more than general influence.

''The influence necessary to invalidate a testamentary document must be a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made [Citations omitted]. From the evidence hereinbefore set forth we find no such showing. The testimony herein amounted to no more than a showing that appellant was so situated as to have an opportunity to unduly influence the mind of the testator and at the most, that the actions of appellant might be described as suspicious. Obviously, under the rulings of appellate tribunals in prior cases, such evidence is entirely insufficient to support the finding of the jury.''

At page 565 this significant language appears: ''Coming now to the third factor, viz., activity on the part of the person

charged with exercising undue influence, the evidence is clear and uncontradicted that appellant was not in the room when the contents of the will were discussed, nor when the testamentary document was executed. Appellant did contact the attorney who prepared the will, but that was at the request of the testator. . . . Securing of an attorney to draw a will for another has been held not to constitute participation. [Citing a case.] In the instant case the evidence conclusively shows that the will was prepared from directions given by the testator to his attorney and there is very strong evidence that it was the testator's voluntary act. . . . In the case now engaging our attention, nothing more was shown than the presence of an opportunity for appellant to influence the testator's mind with a possible interest or motive so to do. This is totally insufficient. Before a testamentary document will be overthrown because of the exercise of undue influence, the proven circumstances must be inconsistent with voluntary action on the part of the testator.''

In reference to the fact that the contested will was at variance with prior wills the court stated (as in the instant case) that there was evidence to explain the variance and concluded on this phase of the case as follows (p. 567) : ''Explanatory matters are to be found ordinarily in the events transpiring in the life of the decedent, changes in his affections, and even the peculiarities of his temperament.''

The court concluded that the finding of undue influence, as a matter of law, was unsupported.

In *Estate of Arnold,* 16 Cal.2d 573 [107 P.2d 25], the trial court granted a nonsuit on the issue of undue influence, granted a judgment notwithstanding the verdict after the jury found decedent incompetent, and admitted the will to probate. The orders of the trial court were affirmed. The contestant was a nephew, the closest living relative of the decedent. The proponents, and principal beneficiaries under the will, were friends. The decedent lived with one of the proponents and she nursed him when he was ill. Decedent was a chronic alcoholic. The evidence showed that a confidential relationship existed between decedent and one of the proponents. There was no evidence that either proponent participated in the drafting of the will. The court stated the proper rule in such cases as follows (p. 577) : ''In an action to set aside a will of a deceased person on the ground of undue influence, it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another

person's will. [Citing a case.] Evidence must be produced that pressure was brought to bear directly upon the testamentary act. [Citing a case.] Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will, and must amount to *coercion* destroying free agency on the part of the testator. [Citing a case—emphasis is that of the court.] It is further held that mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient. [Citing a case.]'' (To the same effect see *Estate of McGivern,* 74 Cal.App.2d 150, 157 [168 P.2d 232]; *Estate of Trefren,* 86 Cal.App.2d 139, 146 [194 P.2d 574]; *Estate of Dopkins,* 34 Cal.2d 568, 575 [212 P.2d 886]; *Estate of Spaulding,* 83 Cal.App.2d 15, 20 [187 P.2d 889]; *Estate of Graves,* 202 Cal. 258, 262 [259 P. 935]; *Estate of Stump,* 202 Cal. 308, 312 [260 P. 543].)

Under the rules announced by these authorities, and many more that could be cited, it must be held that, as a matter of law, there is not sufficient evidence in the record on the issue of undue influence to sustain the challenged finding. There is not sufficient evidence to sustain a finding of suspicion that Rena exerted undue influence, far less to sustain a reasonable inference that such influence was exerted.

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.