Filed 7/3/25

CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Estate of LAYLA BOYAJIAN, Deceased. | |
| | |
| ROBERT BOYAJIAN, as Special Administrator, etc., | G063155 |
| Appellant, | (Super. Ct. No. 30-2020-01176374) |
| v. | O P I N I O N |
| ROBERT BOYAJIAN, | |
| Objector and Appellant. | |

Appeals from a judgment of the Superior Court of Orange County, Ebrahim Baytieh, Judge. Reversed with directions.

Murtaugh Treglia Stern & Deily and James C. Harvey, for Appellant.

Law Offices of Gianna Gruenwald and Gianna Gruenwald for Objector and Appellant.

_____

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III of the Discussion section.

In this will contest, siblings Anush Boyajian and Robert Boyajian assert competing documents regarding their deceased mother's testamentary intent—respectively, a will signed in 2006 and a document signed in 2018. The court ruled for Robert, concluding the 2018 document "canceled" the will, thus revoking it. (Prob. Code, § 6120, subd. (b) (section 6120(b).)[2]

Anush contends the trial court erred because revocation by cancellation must occur by physical alteration of the will—not by a separate, stand-alone document. Robert disagrees but also asserts the revocation was valid pursuant to section 6120, subdivision (a) (section 6120(a)), because the 2018 document qualified as a "subsequent will."

In the published part of this opinion, we conclude California law (1) requires a physical alteration of a will to effect a revocation by cancellation, and (2) a stand-alone revocation does not constitute a subsequent will unless it also transfers property upon death. The court thus erred by giving effect to the 2018 document.

Robert cross-appeals, claiming the record required the trial court to find Anush procured the 2006 will through undue influence. In the nonpublished part of this opinion, we find the court reasonably found there was no undue influence. Thus, we reverse and remand for the court to enter a new judgment giving effect to the 2006 will.

---

[2] All further undesignated statutory references are to the Probate Code and we will refer to individuals by their first names for clarity. Before the submission of this matter in this court, Anush passed away for purpose of appearing in this appeal and waiving oral argument. The trial court appointed Robert as the special administrator of Anush's estate. We granted a motion to substitute Robert for Anush as her personal representative. (Code Civ. Proc., § 377.31; Cal. Rules of Court, rule 8.36(a).)

FACTS

The decedent, Layla Boyajian, was married to her ex-husband, Mike Boyajian, for 50 years. They had four children, including Robert, Anush, and two other daughters. Layla and Mike began divorce proceedings in 2004. Layla perceived Robert as taking her husband's side.

In 2006, when she was 71 years old, Layla signed a two-page holographic will that bequeathed all of her estate to Anush, who lived with Layla at the time.[3] The will's authenticity and formalities are not disputed.

Layla signed a second document in 2018. The document was prepared by Robert. Layla signed it before a notary public but it was not otherwise witnessed. The 2018 document purported to revoke all of Layla's prior estate planning documents:

---

[3] With the exception of addresses, we quote the will verbatim, with the original spelling and grammar, omitting paragraph breaks: "After my death I'm Layla Boyajian Mother of Anush Boyajian. I leave every thing that I ow. my state [address] The Leonardo suit and Davinci Rest to my daughter Anush. The House [address]. All my Juree all my Furniture and gift's Carpts ext to my Anush Boyajian. She is the only one that I will leave. Layla Boyajian I must write Now this till I make the real Trust to my Daughter Anush Boyajian She will be Free after my Death To whom she will help her sister Rita Boyajian her sister R.J. Boyajian Nothing and Nothing to Robert Boyajian or Her Father Mike Boyajian I stamp this with my signature and my Thum. here Layla Boyajian March 3 - 2006 She is the only one I will leave my state To:"

**REVOCATION OF POWERS OF ATTORNEY AND
ESTATE PLANNING DOCUMENTS**

I, LAYLA BOYAJIAN, to hereby revoke any and all estate planning documents I have previously executed, including but not limited to:

1. Powers of Attorney executed by me; without limitation of the foregoing this revocation specifically revokes both of the Powers of Attorney that I executed on January 15, 2014;

2. Advance Health Care Directives;

3. Wills executed by me;

4. Trusts executed by me; and

5. California Confidentiality of Medical Information Act Authorizations for Release of Protected Medical Information executed by me

Dated: April 12, 2018
LAYLA BOYAJIAN

After Layla's death in 2020, Anush petitioned to probate the 2006 will, which she possessed since its creation. Robert contested the petition, claiming Layla had revoked the will by cancellation through the 2018 document. The trial court conducted a bench trial that included dozens of exhibits and both expert and percipient witnesses, including the notary who witnessed Layla sign the 2018 document.

Anush testified she found the will in 2006 while cleaning a room in Layla's house. She denied procuring the will in any way:

"[Counsel:] . . . were you present when it was written by your mother?

"[Anush:] No.

"[Counsel:] Did you stand over your mother and tell her what to write on the 2006 will?

4

"[Anush:] No.

"[Counsel:] Were you in the room when it was written?

"[Anush:] No.

"[Counsel:] Did you tell your mother to write out a will?

"[Anush:] No.

"[Counsel:] Did you suggest a language that appears in the 2006 will?

"[Anush:] No.

"[Counsel:] Did you dictate to her from a different document what to write?

"[Anush:] No.

"[Counsel:] Were you even present when the will was written?

"[Anush:] No.

"[Counsel:] Did you in any way coerce your mother into writing this will?

"[Anush:] No.

"[Counsel:] Did you threaten your mother to get her to write this will?

"[Anush:] No.

"[Counsel:] Did you offer your mother any sort of inducement to write out this will?

"[Anush:] No.

"[Counsel:] Did you withhold anything from your mother like food to get her to write this will?

"[Anush:] No.

"[Counsel:] Did you cry and persuade her and ask her to write out a will in your favor?

5

"[Anush:] No.

"[Counsel:] Did you have any knowledge this will was going to be written before it was written?

"[Anush:] No.

"[Counsel:] Until you found the will as you've described, did you have any knowledge that it had been written?

"[Anush:] No.

"[Counsel:] Did your mother tell you she had written this will before you found it?

"[Anush:] No."

In a detailed statement of decision, the court found Layla had died intestate because the 2018 document had validly revoked the 2006 will. The court found by clear and convincing evidence that the document expressed Layla's specific intent to revoke the will. The court reasoned that the document "constitute[d] a cancellation under . . . section 6120[(b)], even if no physical act was inflicted or applied directly on the will."

The court rejected both Anush and Robert's arguments that the other had unduly influenced Layla to sign the 2006 will and 2018 document. For the will, the court concluded that, although the evidence showed "Anush indirectly (or maybe even directly) influenced Layla in writing the 2006 will[,] . . . the court finds that the combined evidence of probable and likely influence by Anush does not rise to the level of undue influence" necessary for Robert to prevail on the issue.

## DISCUSSION

Section 6120 provides two grounds for revoking a will: "A will or any part thereof is revoked by any of the following: [¶] (a) A subsequent will which revokes the prior will or part expressly or by inconsistency. [¶]

6

(b) Being burned, torn, canceled, obliterated, or destroyed, with the intent and for the purpose of revoking it, by either (1) the testator or (2) another person in the testator's presence and by the testator's direction."

We interpret the statute de novo, starting, "as always, with the text." (*City of Los Angeles v. PricewaterhouseCoopers, LLP* (2024) 17 Cal.5th 46, 64.) """If we find the statutory language ambiguous or subject to more than one interpretation, we may look to extrinsic aids, including legislative history or purpose to inform our views." [Citation.] Ultimately, we must ""select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences."""" (*Ibid.*)

I.

REVOCATION BY CANCELLATION REQUIRES PHYSICAL ALTERATION

The trial court held the 2018 document "canceled" the 2006 will pursuant to section 6120(b), finding Layla specifically intended the document to revoke the will. While revocation may well have been Layla's intention, the Probate Code requires more to effect a revocation by cancellation.

The word "canceled" is reasonably susceptible to both broad and narrow interpretations. Broadly, "cancel" might mean to invalidate by any means. One might cancel a subscription online or by phone call. One might cancel a contract by giving separate written notice.

But back in the Gilded Age, our high court gave "cancel" a narrow, hyper technical sense. It construed a predecessor statute of section 6120 and explained that, "[i]n its primal significance," to cancel a will required a "lattice work" or "'criss-cross'" drawn on top of preexisting text. (*Estate of Olmsted* (1898) 122 Cal. 224, 230; *id.* at p. 229 [citing former Civil

7

Code § 1292].) While this 127-year-old case is still good law, even if we found "canceled" to be ambiguous, extrinsic aids confirm the Legislature intended it to be used in a narrow sense.

Construing section 6120 invites analysis of the Uniform Probate Code. The statute is "the same in substance as Section 2-507 of the Uniform Probate Code (1987)." (Cal. Law Revision Com. com., 53 West Ann. Code Prob. Code (2022 ed.) foll. § 6120, p. 197; accord § 2, subd. (b) [where Probate Code adopts Uniform Probate Code, it "shall be so construed as to effectuate the general purpose to make uniform the law . . . ."].)

The official comments to Uniform Probate Code section 2-507 note that revocation by act requires something be "done to the" will: "Revocation of a will may be by either a subsequent will or an authorized act done to the document." (8 West's U. Laws Ann. (2023) U. Prob. Code (2019), com. to § 2-507, p. 134.)

Requiring an act "done to the" will is consistent with England's 1677 Statute of Frauds, which allowed revocation by "a 'revocatory act'" such as "burning, canceling, tearing, or obliterating the will . . . ." (Horton, *Revoking Wills* (2022) 97 Notre Dame L.Rev. 563, 570 (*Revoking Wills*).) And it is consistent with section 6120(b), which allows revocation when a will is "burned, torn, canceled, obliterated, or destroyed . . . ." As a statutory word "literally 'is known by its associates,'" the word "canceled" is still best construed to require a physical act akin to burning, tearing, obliterating, or destroying. (*People v. Prunty* (2015) 62 Cal.4th 59, 73.)

Requiring a physical alteration to the will to find a revocation is an ancient concept, perhaps in need of revisiting. (See *Revoking Wills*, *supra*, 97 Notre Dame L. Rev. at p. 570 [criticizing requirement].) But Robert presents no recent California authority expanding the concept of cancellation

8

beyond its historically narrow sense of a "lattice work" or "'criss-cross'" drawn over text. (*Estate of Olmsted, supra*, 122 Cal. at p. 230.)  As a stand-alone document, the 2018 revocation could not and did not cancel the 2006 will.

## II.

### THE 2018 DOCUMENT IS NOT A "SUBSEQUENT WILL"

Robert alternatively contends we can affirm the judgment by deeming the 2018 document to be a "subsequent will" that revoked the 2006 will pursuant to section 6120(a). Although Anush correctly notes that this theory was not presented to the trial court, we exercise our discretion to consider it because it parallels the litigated issue and raises a pure question of law based on undisputed facts. (*Farrar v. Direct Commerce, Inc.* (2017) 9 Cal.App.5th 1257, 1275–1276, fn. 3.)

Robert relies on the Probate Code's definition of "will," which at first blush might be parsed to include a stand-alone revocation. Section 88 provides: "'Will' includes codicil and any testamentary instrument which merely appoints an executor or revokes or revises another will." There is no dispute the 2018 document merely revokes a will.

Nonetheless, we find three hurdles to applying this definition of "will" to the 2018 document.

First, the 2018 document is not a "testamentary instrument." The Probate Code defines "instrument" to require a beneficiary designation or property transfer: "'Instrument' means a will, a document establishing or modifying a trust, a deed, or any other writing that designates a beneficiary or makes a donative transfer of property." (§ 45.) And what makes a document "testamentary" is the revocable disposition of property upon death: "Before an instrument may be probated as a will it must appear from its terms . . . that it was executed with testamentary intent. The testator must

have intended, by the particular instrument offered for probate, to make a revocable disposition of his property to take effect upon his death." (*Estate of Sargavak* (1950) 35 Cal.2d 93, 95.)

The 2018 document meets neither the Probate Code's definition of "instrument" nor the Supreme Court's conception of "testamentary intent." It names no beneficiary. It does not transfer or dispose of any property upon Layla's death.[4]

Second, the 2018 document was not witnessed by two persons. The Probate Code requires that a "will shall be witnessed by being signed, during the testator's lifetime, by at least two persons . . . ." (§ 6110, subd. (c)(1).)

Robert tries to avoid the witness requirement by relying on Section 6110, subdivision (c)(2), which was added in 2008 (Stats. 2008, ch. 53, § 1), presumably in response to the Supreme Court's recognition that California had not yet "adopted a 'harmless error' provision similar to Uniform Probate Code section 2-503." (*Estate of Saueressig* (2006) 38 Cal.4th 1045, 1053.) To be sure, the 2008 amendment gives effect to an unwitnessed will "if the proponent of the will establishes by clear and convincing evidence that, at the time the testator signed the will, the testator intended the will to

---

[4] We are unpersuaded by Robert's citation to "thelawdictionary.org" and its dramatically broader definition of "testamentary instrument," which would include any "[d]ocument or will creating, extinguishing or transferring interest in or the right to an asset or property."

constitute the testator's will."[5] (§ 6110, subd. (c)(2).) But critically, the 2008 amendment stops short of adopting the full harmless error provision of the Uniform Probate Code.

Omitted from section 6110, subdivision (c)(2) is the portion of the Uniform Probate Code that would give effect to the decedent's intent concerning "a partial or complete revocation of the will." (8 West's U. Laws Ann. (2023) U. Prob. Code (2019) § 2-503, subd. (2), p. 129.) We conclude the omission was intentional, reflecting the Legislature's judgment that witness formalities are still required to turn a stand-alone revocation into a will.

Third, Robert cites no California case giving effect to a stand-alone revocation that did not also make a donative transfer or revocable disposition upon death. Robert cites no California practice guide instructing practitioners to advise their clients they may revoke wills with stand-alone revocations.

We readily acknowledge probate law trends towards flexibility. For example, "formalities should not be allowed to defeat the testator's intent when clear and convincing evidence satisfies the evidentiary concerns underlying the formalities of the statute of wills." (*Estate of Duke* (2015) 61 Cal.4th 871, 893; *id.* at p. 879 [allowing extrinsic evidence to show reformation].) A respected wills and trusts professor laments that "revocation doctrine has never received sustained attention," yet "consists of tripwires and traps for the unwary." (*Revoking Wills, supra,* 97 Notre Dame L.Rev. at p. 563, italics omitted.) He notes the Uniform Probate Code's "harmless error

---

[5] As Robert did not pursue the "subsequent will" theory below, the trial court did not find whether Layla intended the 2018 document to "constitute [her] will." (§ 6110, subd. (c)(2).) The court instead found only that Layla "had the specific intent to revoke the 2006 will."

11

rule . . . spills over into the realm of revocation" (*id.* at p. 612) and criticizes the "handful of jurisdictions" with "'narrow' revocation legislation [that] limit written revocations to full-fledged 'will[s] which revoke[] the prior will'" (*id.* at p. 590; see also *id.* at p. 591 [citing cases disallowing stand-alone revocations, dubbed "anti-wills"]).

California remains among this handful of states, having declined to enact the Uniform Probate Code's harmless error rule for "a partial or complete revocation of the will." (8 West's U. Laws Ann. (2023) U. Prob. Code (2019) § 2-503, subd. (2), p. 129.) The Legislature has set the limit to which it is willing to incorporate harmless error analysis into our revocation rules. Perhaps this too deserves revisiting.

### III.

### ROBERT HAS NOT SHOWN THE COURT WAS COMPELLED
### TO FIND UNDUE INFLUENCE

Finally, Robert contends that even if we conclude no revocation was perfected, we should nonetheless affirm the trial court's invalidation of the 2006 will. (§ 6104.) Robert argues the court erred by ruling that he failed to show Anush unduly influenced Layla's creation of the 2006 will. (§ 8252, sub. (a).)

At trial, Robert bore a "heavy burden" to prove undue influence by clear and convincing evidence. (*Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 545.) On appeal, ""the question becomes whether the . . . evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'"" (*Center for Healthcare Education & Research, Inc. v. International Congress for Joint Reconstruction, Inc.* (2020) 57 Cal.App.5th 1108, 1125 (*Center for Healthcare Education.*)

By statute, "'[u]ndue influence' means excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (Welf. & Inst. Code, § 15610.70, subd. (a); § 86 [adopting Welf. & Inst. Code definition].) Factors include: "(1) The vulnerability of the victim," "(2) The influencer's apparent authority," "(3) The actions or tactics used by the influencer," and "(4) The equity of the result." (Welf. & Inst. Code, § 15610.70, subd. (a).) By common law, "[u]ndue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96; *David v. Hermann* (2005) 129 Cal.App.4th 672, 684–685 [balancing factors]; accord, § 86 [statute supplements common law].)[6]

Robert fails to show his evidence of undue influence was not "'"'uncontradicted and unimpeached.'"'" (*Center for Healthcare Education, supra*, 57 Cal.App.5th at p. 1125.) Most notably, Anush flatly denied even knowing about the 2006 will until she found it: "[Counsel:] Did you have any knowledge this will was going to be written before it was written? [¶] [Anush:] No." She denied playing any role in obtaining it.

In addition, evidence contradicted Robert's claim that Layla was vulnerable in 2006 due to the emotional distress caused by her divorce. The trial court found it "true that in 2006 Layla was emotionally distressed," but also concluded "Layla was not vulnerable . . . to the point where Anush . . . unduly influenced her in connection with the 2006 will." The court

---

[6] Robert does not argue any presumption applied. (*Bernard v. Foley* (2006) 39 Cal.4th 794, 800 [common law presumption]; *Rice v. Clark, supra*, 28 Cal.4th at pp. 96–97 [statutory presumption section 21380 predecessor].)

13

also noted "very credible evidence indicating that around the time Layla wrote the 2006 will, she was able to appropriately participate in court, including multiple hours of depositions and meetings." "It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.)

Robert's evidence also left room for the trial court to find it insufficient. For example, even accepting his view about Anush's assertiveness, the court explicitly reasoned that even though "Layla's children influenced her and most likely persuaded her to act in certain ways . . . [¶] . . . the evidence [did] not support a finding that Anush *unduly* influenced Layla in 2006, or that Anush *excessively* persuaded Layla in 2006." (Italics added.) Distinguishing between degrees of influence is the trial court's duty—not all influence is undue. Influence "is not *undue* unless the pressure has reached a point where the mind of the person subjected to it gives way" and "represents in truth but the conviction or desire of another." (*Estate of Anderson* (1921) 185 Cal. 700, 707, italics added.) In other words, Robert has not demonstrated why the evidence compelled a result contrary to what the trier of fact determined. (*Center for Healthcare Education, supra*, 57 Cal.App.5th at p. 1125.)

Robert instead proposes five essential questions courts must

14

consider in deciding undue influence.[7] Given that the statutory factors of "'[u]ndue influence'" and common law factors work together (§ 86), we take no issue with the notion that answers to some of the questions can help support a finding of undue influence.

But answering these questions does not compel a conclusion of undue influence. Robert does not cite to any case where a trial court found *against* undue influence and an appellate court *reversed* that factual determination.

Robert attempts to analogize to *Estate of Garibaldi* (1961) 57 Cal.2d 108, where a trial court finding of undue influence was affirmed. (*Id.* at pp. 109–110, 114.) There, three children had unduly influenced their mother (the decedent testator) while partnering with her in ranch operations during a period when "[s]he was under the constant care of a physician." (*Id.* at pp. 109, 110, 111.) The children "engaged in a course of fraudulent conduct designed to conceal from decedent the large increase in her net worth." (*Id.* at pp. 113–114.)

No similar facts are presented by Robert here. Robert has not shown Layla was under a physician's care, enfeebled, or confused. Robert has not shown Anush concealed material facts from Layla. There is no direct evidence of Anush pressuring Layla in any way. While Robert offers some

---

[7] "[(1)] Does the will cut off the natural objects of the decedent's bounty, and unduly benefit the proponent? [¶] [(2)] Is there a variance between the terms of the will and the expressed intentions of the testatrix? [¶] [(3)] Was there an opportunity afforded by the legatee's relationship to the decedent to influence the testatrix? [¶] [(4)] Was the decedent's mental and physical condition such as to permit a subversion of her freedom of will? [¶] [and (5)] Was the beneficiary active in procuring the execution of the will?" (*Estate of Williams* (1950) 99 Cal.App.2d 302, 311; accord, *Estate of Yale* (1931) 214 Cal. 115, 123.)

15

evidence that may have tended to show undue influence,[8] he has not shown his evidence is "'"'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'"'" (*Center for Healthcare Education, supra*, 57 Cal.App.5th at p. 1125.)

### DISPOSITION

The September 20, 2023 order for probate is reversed and the matter is remanded with directions for the trial court to (1) vacate the September 20, 2023 letters of administration, (2) admit the 2006 will to probate, and (3) conduct any further proceeding in a manner consistent with this opinion. Robert Boyajian, as the special administrator of Anush Boyajian's estate, is entitled to costs in this appeal.

SCOTT, J.

WE CONCUR:

MOORE, ACTING P. J.

SANCHEZ, J.

---

[8] Robert notes that Anush was not credible in explaining her 12-year custody of the uniquely worded 2006 will. Robert also cites to the trial court's findings that at relevant times: Layla was emotionally distressed from her marriage ending; she wanted to ensure the financial security of all three of her daughters; she had lived with Anush, who was in a position to exert influence over Layla; and Anush could be very assertive with her parents.